# Commonwealth *v.* Wendt, Appellant.

*Criminal law—Murder—First degree—Evidence—Sufficiency—Motive—Earlier related offense—Admission—Denial at trial—Corroborative evidence of admission—Self-defense—Court and jury—Appeals—Review—Practice, Supreme Court.*

1. In reviewing a murder case the Supreme Court does not sit as upon a motion for a new trial to determine where the weight of evidence lies, but to determine whether the ingredients necessary to constitute murder of the first degree shall have been proved to

exist. Where these have been proved, the question of the guilt or innocence of the defendant is for the jury.

2. On the trial of a homicide case the prosecution may show defendant's participation in an earlier offense in order to establish motive for the commission of the homicide, and where the guilt of such earlier offense has been shown by an admission of the defendant before the trial the Commonwealth may, if defendant disputes his guilt thereof at the trial, produce further evidence, relevant to the question of motive arising out of the earlier offense, with the view to support and sustain the admission.

3. On the trial of an indictment for murder there was evidence that defendant and his brother had burglarized a store on the night preceding the murder and early on the day of the murder had admitted their participation in the burglary to a witness and showed him certain articles they had taken. This witness informed a constable, who, unaccompanied and unarmed, proceeded to a woods where defendant and his brother had been seen. Shortly thereafter a dozen or more shots were heard from the direction of the woods and another constable hurried to the scene and saw defendant and his brother running in the opposite direction. Deceased had been shot six times in front and four times in the back. Defendant and his brother fled, taking with them decedent's watch and money and both were apprehended a year after the shooting in another jurisdiction. There was evidence that both defendant and his brother were acquainted with the constable and knew him to be an officer. The defense set up was self-defense, defendant contending that he did not know deceased to be an officer; that deceased had fired the first shot at him and had hit him in the right hand and arm; that they then clinched; that decedent fell and defendant and his brother dragged him face downward into nearby bushes and fled. It appeared from testimony of witnesses for the Commonwealth who saw the defendant the day after the shooting that he was not then suffering from any injury to his hand or arm. *Held,* a verdict of guilty of murder of the first degree was warranted by the evidence and should be sustained.

4. In such case where defendant's confession of his participation in the burglary was admitted for the purpose of showing his motive in killing the officer, the Commonwealth was properly permitted to present further evidence corroborative of defendant's admission where he denied at the trial that he had committed the burglary.

5. In such case where defendant after having confessed to his guilt of the burglary denied at the trial that he had participated in it, the court did not err in charging "Now the......robbery—the earlier offense—which has been referred to, to my mind is important

in another aspect of the case; it will probably help you to determine what weight will be placed upon the evidence of the defendant in this case."

Argued April 17, 1917.  Appeal, No. 88, Jan. T., 1917, by defendant, from judgment of O. T. Blair Co., Jan. Sessions, 1917, No. 2, on verdict of guilty of murder of the first degree in case of Commonwealth v. Frank Alfred Wendt.   Before BROWN, C. J., MESTREZAT, POTTER, STEWART and MOSCHZISKER, JJ.   Affirmed.

Indictment for murder.   Before BALDRIGE, J.

The facts appear by the opinion of the Supreme Court.

Verdict of guilty of murder of the first degree; sentence of death by electrocution was imposed.   Defendant appealed.

*Errors assigned*, among others, were the charge of the court and various rulings of evidence.

*W. C. Fletcher*, with him *John J. Haberstroth*, for appellant.—On the trial of a homicide case where evidence of other crimes is admitted to show motive, it is the duty of the court to restrict the jury in their consideration of such testimony exclusively to the purpose of its admission so that they will not give it unwarranted weight as evidence proving the main fact: Taylor v. State, 22 Texas App. 529 (3 S. W. Repr. 753) ; Commonwealth v. Ferrigan, 44 Pa. 386; Goersen v. Commonwealth, 106 Pa. 477.

*Marion D. Patterson*, District Attorney, with him *George G. Patterson*, for appellee.—Evidence of the robbery was clearly admissible for the purpose of showing identification, and to show a motive for murder: Commonwealth v. Major, 198 Pa. 290; Commonwealth v. Chiemilewski, 243 Pa. 171; Commonwealth v. Valverdi, 218 Pa. 7; Commonwealth v. Bobanic, 62 Pa. Superior Ct. 40.

If a witness wilfully and corruptly swears falsely to any material fact in a case, the jury are at liberty to disregard the whole of his testimony: Commonwealth v. Ieradi, 216 Pa. 87; Commonwealth v. Sutton, 51 Pa. Superior Ct. 191. It is the undoubted right of a judge and often it is his duty to express to the jury his opinion of the weight and the effect of the evidence: Commonwealth v. Cunningham, 232 Pa. 609; Blumenthal v. Green, 52 Pa. Superior Ct. 292; Commonwealth v. Breyesse, 160 Pa. 451.

OPINION BY MR. JUSTICE STEWART, May 22, 1917:

The appellant stands convicted of the crime of murder of the first degree under an indictment charging him with the murder of Michael McGinley, on the 13th of October, 1915, despite the very earnest contention made on his behalf that the act of killing was done in self-defense. This was the only defense set up. On the appeal our first duty is to determine whether the evidence reasonably admits of the conclusion that the killing was wilful, deliberate and premeditated. If it so appears, the responsibility of determining the guilt rested exclusively with the jury. "We do not sit," said the court in McCue v. Commonwealth, 78 Pa. 185, 189, "as upon a motion for a new trial, to determine where the weight of evidence lies, but to determine whether the ingredients necessary to constitute murder of the first degree shall have been proved to exist. These being proved, the jury must determine the guilt or innocence of the prisoner."

The case, on the evidence, presents these facts. That McGinley met his death at the hands of the appellant is not questioned. About midday of the 13th of October, 1915, in company with a younger brother, appellant was at a place just outside the limits of Altoona, known as Slippery Race Woods, both being armed with revolvers. According to appellant's statement on the stand, they had gone to this place to shoot mark. The night before the last preceding night, a store in the City of Al-

toona had been forcibly entered by two men, who over-
came one of the proprietors who happened to be in the
store at the time, and robbed from him his watch and
such money as he had on his person, and stole from the
store different articles of merchandise.   During the fol-
lowing day, search was being made for the perpetrators
of the felony.   McGinley, the man slain, was a constable
of the city.   About noon of that day, he was told by one
Jack Coyle, that he had been to Slippery Race Woods,
had there met Frank Wendt, this appellant, and his
brother, Walter Wendt, both of whom had told him that
certain parties who had been arrested on suspicion of
being the guilty parties, and who were to have a hearing
that afternoon, were innocent, and that they themselves
had committed the offense, exhibiting at the time some
of the fruits of the felony, among other things the watch
and pocket book that had been taken from the person of
the store proprietor, a watch of the value of $100.   Mc-
Ginley at once, acting on this information, without war-
rant, unaccompanied and unarmed, proceeded out to the
woods with a view to arrest the parties.   He was seen
to approach the woods and enter.   Shortly thereafter
about a dozen or more shots were heard from the direc-
tion of the woods.   Another of the city's constabulary
force who had been requested by McGinley to join him
at a point not far from the woods, but had been delayed
for some reason, entered the woods after the shots had
been heard.   As he proceeded he saw nothing of Mc-
Ginley, but he saw the defendant and his brother at the
place where McGinley's body a little later was found.
When he was seen by them, they immediately turned and
ran in the opposite direction from that in which he was
advancing.   He pursued, but was unable to overtake
either of them.   That was the last seen of either until
they were arrested a year after in Milwaukee, Wisconsin.
Search was immediately instituted for McGinley, and a
very short time thereafter his body was found concealed
behind bushes, at or near the place from which they had

started to run as the officer advanced upon them. An examination of the body disclosed six pistol shot wounds in the front, three of them immediately over the heart and four in the back. That death resulted from these wounds is not questioned; neither is the fact that the wounds were inflicted by the Wendts, one or both. An examination of the clothing of the dead man showed a piece of a watch chain hanging from the vest, the other part of the chain was missing, as also the watch and a pocket book in which there was money. Appellant and his brother were the only living witnesses to the occurrence of the homicide. When arrested at Milwaukee, nearly a year after the offense was committed, the appellant denied that he was Alfred Wendt, claiming an entirely different name; even when confronted with a photograph of himself he denied his identity as Wendt, and declared that he had never been in Pennsylvania. What we have so far related of the occurrence is derived from the testimony on the part of the Commonwealth. The theory of the prosecution was that the murder was committed with a view to escape arrest and conviction for the felony committed in the store at Altoona, above referred to. Evidence was admitted with respect to this felony and the participation of the appellant therein, which warranted even more than a reasonable inference that the actuating motive for the killing of McGinley was the desire to avoid arrest. Some of the significant conclusions derivable therefrom were, that McGinley was known by appellant and his brother to be a peace officer, he having on several occasions arrested the appellant and had repeatedly arrested the younger of the two for offenses which resulted in jail sentences; that immediately upon the killing of McGinley they concealed his body by dragging it in a brutal and heartless way into a thicket at the side of the path or road; that upon their discovery they fled at sight of another officer who both well knew to be a policeman, and then fled the jurisdiction of the court, carrying with them their

victim's watch and pocket book, as well the watch that had been stolen from the person of the proprietor of the store that had been broken into.  Certainly it needs no discussion to show that every essential to the crime of murder of the first degree,—intent to kill, deliberation and premeditation, are plainly derivable from the facts thus presented.

Turning now to the defense set up.  Defendant testified that he was seated on a log in the woods cleaning his revolver, his brother being but a few feet away, when McGinley approached; that he did not know McGinley and had not seen him until a shot was fired and his brother started to run and fell within about ten feet from where the defendant was as the shot was fired; that he then turned and saw McGinley at a distance from 80 to 100 feet approach with a revolver in his hand, and heard him call "Stop! or I'll blow your—head off." With that defendant says he received a shot from Mc-Ginley's gun in the right arm, and at once started toward McGinley with a 25-caliber gun in his hand, with a view, he says, to make McGinley stop shooting; that they finally met and just as they were coming together he received another shot from McGinley in his right hand.  He was then asked, "Then what did you do?" His reply was, "I don't know much about that." This question followed, "Do you know of your clinching, taking hold of each other?"  Answer, "I do, I was trying to get his gun away from him."  Another question was, "When did McGinley stop fighting?"  His answer was, "When he dropped."  His testimony on cross-examination went more into details and was in part as follows: Q. "All the while after McGinley shot you the first time he kept coming toward you?"  A. "Yes sir."  Q. "So you and he were traveling that 80 feet at the same time?" A. "Yes sir."  Q. "Were you running?"  A. "I don't know."  Q. "And you don't know whether McGinley was running?"  A. "No sir."  Q. "You ran into the muzzle of this man's gun?"  A. "I suppose."  Q. "Ran right

up to it?" A. "Yes sir." Q. "And then as you got to him and as you were about to put your arm around him to take hold of him he put another bullet into your hand?" A. "Yes sir." When asked why, after he had received a shot in his arm thirty feet away, he did not try to escape, his reply was, "It was all too quick." This question then followed, Q. "But not too quick for you all the time to advance toward him, is that all right, you kept all the time going toward your assailant?" A. "Yes sir." Q. "Had you down to that time fired one shot from your gun?" A. "I did." Q. "When did you commence to shoot?" A. "After I got hit." Q. "How many shots did you fire as you advanced toward him?" A. "I don't know." Q. "Do you know whether you hit him at all?" A. "No sir." Q. "You have heard the testimony that in this man's body were four shots believed to be from an automatic 25, explain how they got there?" A. "I don't know." Q. "Was McGinley's back toward you?" A. "I don't know, not when he was coming towards me." Q. "When you fired your automatic was his back turned toward you and was he running away?" A. "No sir." Q. "As you got down there did he keep on firing as you came over the 25 or 30 feet?" A. "I suppose he did." Q. "Did you count the shots that McGinley fired from his gun after those three first?" A. "I didn't count any of them at all." Q. "What did McGinley say to you when you met?" A. "I don't know." After saying that he and McGinley were struggling, he was asked, "When did you take hold of him?" A. "I don't know." Q. "Did you punch him in the face?" A. "I don't know." Q. "Did he hit you?" A. "I don't know." Q. "You know that you took hold of each other?" A. "Yes sir." Q. "You had your gun in your hand and were shooting all the while?" A. "Yes sir." Q. "He kept on firing his gun and you kept on firing your gun as you marched towards each other?" A. "Yes." Q. "And neither said a word to the other?" A. "No sir." Q. "Will you explain how these four bullets of your 25 entered this man's

back?"    A. "While we were struggling, I suppose."    Q. "Did you take McGinley's gun from him?"    A. "I did, because I had it afterwards."    Q. "And is that all the definite information that you will give us?"    A. "Yes sir."    Having testified that McGinley had fallen in the struggle, he was asked whether he was then dead or alive. He replied that he didn't know, that he didn't examine to see, that he did not turn him over, that he went back to see where his brother was, that he was not where he had fallen when running away and had gone up into the woods and called for him and his brother then appeared. This question followed, Q. "Then what did you do?"    A. "I asked him whether he was hurt."    The cross-examination proceeded.    Q. "And after you had seen to it that no more hurting would be done by McGinley, that day nor forever, you found out that your brother was not hurt?"    A. "Yes sir."    Q. "You received the information that he was unharmed, now what did you do?"    A. "Then I asked him who he, (referring to the dead man), was."    Q. "Then, and not until the victim was dead, you learned his identity, did you?"    A. "Yes sir."    Q. "Did you think before that it was some man coming to rob you?"    A. "I don't know what I thought."    Q. "After it was all over, did you know that he was dead?"    A. "No sir."    Q. "You didn't stop to look how many shots he had received?"    A. "No sir."    Q. "After you saw Walter, did you go back to see if he was dead?"    A. "No sir."    Q. "Did you go back to the body at all?"    A. "Yes sir."    Q. "What did you go back for?"    A. "We was going to put it away."    Q. "Why were you putting it away?"    A. "Walter said we had better put him in the bushes and get out of here."    Q. "Why did you want to join in anything of that kind, why did you want to get away; you shot this man in self-defense, you had to kill this man to save yourself, didn't you?"    A. "Yes sir."    Q. "When you had done that, why did you want to hide the body and want to run away?"    A. "I don't know."    Q. "Tell us, in so far as you can, why you wanted to put this man's

body away whom you had killed in self-defense, and why you wanted to run away?" A. "I don't know." Q. "Walter suggested you had better get him away, did you look to see if he was dead?" A. "No sir." Q. "Was he dead?" A. "I don't know." Q. "Did you try to talk to the prostrate form and see if there was anything you could do to relieve his suffering?" A. "No sir." Q. "Where did you take him?" A. "Just dragged him about five feet." Q. "You dragged him, did you?" A. "Yes sir." Q. "You took one leg and Walter the other?" A. "Yes sir." Q. "And had you turned him over then to see how many wounds he had in front?" A. "I don't know." Q. "I want you to tell us whether you dragged him with his face down or his face up?" A. "His face down, as far as I can remember." Q. "And you didn't know whether he was dead or alive?" A. "No sir." Q. "Then you dragged him across that rough surface, into those bushes, not knowing whether he was still living, and with his face to the ground?" A. "Yes sir." Q. "You knew what you were doing then, didn't you?" A. "Yes sir." Q. "You thought it was best for you and Walter to get away from the scene of that tragedy, whether McGinley lay in those bushes dead or alive, is that right?" A. "Yes." Q. "After you placed the body over there, did you look through his pockets?" A. "No sir." Q. "Did you look over the ground to see if he had dropped anything from his pockets?" A. "Yes, we looked over the ground and I picked up my gun and Walter picked up the watch."

We have recited so much of the defendant's testimony, not only for the frequent admissions there occurring that it was his hand that slew McGinley, but that it might the more clearly appear upon what slight basis the theory of self-defense was made to rest. The evidence of the case supported the contention that McGinley went into the woods unarmed. If this was the conclusion reached by the jury, the story told by the defendant was simply incredible; all the more, if the jury credited,

as they must have done, the testimony of the witnesses called by the Commonwealth, who swore that they had seen the defendant the next day or the following day after the homicide at Akron, Ohio, and Cleveland, and that he had no sign of wound or injury on either hand, stating the opportunities they had of hearing and knowing, the defendant having sworn that upon reaching Cleveland his wound had become so painful that it was there dressed and bandaged.    The evidence of the Commonwealth supported the further contention that defendant knew McGinley was a constable.    If this was the conclusion reached by the jury, the defendant was without pretext in resisting him.    Upon defendant's own admission, he began firing at McGinley when from 80 to 100 feet away from him and advanced toward him firing at him all the way until they came together.    The defendant's statement inherently and intrinsically afforded abundant ground for the jury discrediting it wholly, and this is what they evidently did.    On this branch of the case further comment is unnecessary; the question was for the jury and under instructions from the court, entirely free from error, they decided it adversely to the defendant.

The several assignments of error all relate in one way or another to the evidence admitted touching the commission of the earlier crime of breaking into the Altoona store, the felony therein committed and the defendant's complicity therein.    This evidence was admitted for the purpose of showing motive for the commission of the homicide for which the defendant was being tried.    Its competency for that purpose was not denied; it is complained, however, that it went beyond that, both in its admission and its application; that once having shown a confession by the defendant that he was guilty of that particular offense, the inquiry should have stopped there, and that it did not serve in any way to prove motive by introducing in evidence the details of that offense.    Counsel contend that their client was seriously prejudiced by

the latitude that was thus allowed by the court, in that it introduced into the case a question of character, which defendant had not placed in issue and was not therefore open to attack.

We fail to find anything in the evidence touching the earlier offense that would impair the defendant's character and reputation to any greater degree than the proof of defendant's guilt in connection therewith necessarily would. Nothing in any of the details or particular circumstances that were developed by the testimony aggravated it beyond what usually attends the commission of offenses of like character. The prosecution had a right to show the participation in the earlier offense in order to establish motive for the commission of the later, for which he was being tried. If defendant's character suffered in consequence, it was not from the latitude allowed in the admission of evidence, but from the persuasiveness of the evidence that he was the guilty person. Furthermore, there is no rule of evidence which, in such cases as this, concludes the prosecution where an admission of guilt of the earlier offense has been shown, from producing further evidence, if it can, relevant to the question of motive arising out of the earlier offense, with the view to support and sustain the admission if afterwards questioned.

The learned trial judge, in his charge to the jury, after stating the contention of the prosecution that motive for the killing of McGinley to escape from arrest and trial could be derived from the testimony showing the defendant's guilt of the earlier offense, proceeded thus: "Now the Kelchner robbery—the earlier offense—which has been referred to, to my mind is important in another aspect of the case; it will probably help you to determine what weight will be placed upon the evidence of the defendant in this case." It is the contention of the appellant that by this instruction the jury were given to understand that if they were satisfied from the evidence that the defendant was guilty of the earlier offense, they might take such fact into consideration in determining

the weight they were to give his testimony in the case they were trying.    The only thing that gives color to such complaint is the use by the court of the expression ".Kelchner robbery."    The trial judge certainly did not mean that if the jury believed from the evidence that if defendant was the perpetrator of that offense, the mere fact of his guilt, of itself, disassociated from everything else in the case, would discredit him as a witness in the present case.    What the court had in mind was the testimony of the defendant in which he made positive and unqualified denial that he had participated in any way in the earlier felony.    Here was such an irreconcilable conflict between his denial of guilt and the testimony adduced by the Commonwealth to show his guilt, that if the jury accepted as true the testimony of the Commonwealth on this issue, and rejected the testimony of the defendant, they were at liberty to take such fact, known only to themselves, into consideration in determining the weight they would give to defendant's testimony with respect to the facts and circumstances attending the homicide, quite a different issue.    The crediting by the jury of the witnesses on one side was necessarily a discrediting the other, and to that extent an impeachment of its credibility.    The testimony related to a collateral issue, and we fail to see any reason why the jury trying the issue in the homicide case should be required to dismiss from their minds whatever was legitimately learned by them in the trial of the collateral issue which was so material to a correct determination of the main issue. Nor do we see any sufficient reason to suppose that the jury gave any other construction to the charge of the court than we have here given it.

Upon a review of the whole case we are of opinion that no substantial error was committed by the court; that the evidence fully justifies the verdict rendered and that the judgment of the court should be affirmed.    It is so ordered, and the record is remitted for purposes of execution.