114

monwealth v. Archambault, 448 Pa. 90, 290 A. 2d 72 (1972).

Mr. Justice MANDERINO joins.

Commonwealth v. Miller, Appellant.

116

Submitted November 16, 1971. Before BELL, C. J., JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

*John J. Krafsig, Jr.,* for appellant.

*Keith B. Quigley,* Special Assistant Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE O'BRIEN, April 20, 1972:

Appellant was indicted for murder, voluntary manslaughter and involuntary manslaughter in connection with the fatal shooting of Edward Louden on March 11, 1968, in Watts Township, Perry County. After a jury trial, appellant was found guilty of second-degree murder. Post-trial motions were denied and the appellant was sentenced to a term of five to twenty years' imprisonment. This appeal followed.

The appellant provided the only eyewitness testimony concerning the homicide. His version of the fatal encounter was that the deceased, in the company of one George Miller, arrived at appellant's home—a single-room dwelling—at approximately 9:30 on the night of the shooting. Shortly thereafter, George Miller de-

parted, leaving appellant and the deceased alone in appellant's home. Appellant testified that the deceased began drinking port wine which appellant had purchased earlier in the day, became intoxicated and threatened to kill appellant. During this diatribe, appellant was lying in bed but, upon hearing a click, which appellant interpreted as "breaking the gun," he arose and discovered the deceased rising from a chair with appellant's shotgun in his possession. Appellant allegedly grabbed the barrel of the shotgun, wresting it from the deceased's grasp, reversed the gun so that it was pointing in the direction of the deceased and attempted to apply the safety mechanism which necessitated fingering the trigger. At this point, the deceased allegedly shoved the appellant, causing him to fall backwards and, while appellant was falling, the gun discharged, fatally striking the deceased in the area of the chest.

In support of his alternative motions, appellant advances several contentions: (1) the evidence was insufficient to sustain the verdict of second-degree murder; (2) the court below erred in instructing the jury on self-defense; (3) appellant's confession was involuntary and, therefore, inadmissible; (4) the court below erred by stating its opinion regarding voluntary manslaughter; (5) appellant's case was prejudiced by the introduction of inflammatory photographs; (6) failure to record the voir dire examination of jurors deprived appellant of a meaningful appeal; and (7) the court below erred in instructing the jury that, should it return a verdict of guilty of first-degree murder, it would not be left to the jury to determine the sentence.

In support of his first contention, appellant relies on his own testimony, both in his confession and in his direct testimony, that the shooting was accidental, and that of a witness for the Commonwealth, who testified

that appellant, subsequent to the fatal shooting, stated to the witness that the killing was in self-defense. Appellant's argument relates to credibility, not sufficiency. ". . . [I]n determining the sufficiency of the evidence, be it direct or circumstantial, the test is whether, accepting as true all of the evidence and all reasonable inferences arising therefrom, upon which if believed the jury could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime or crimes of which he has been convicted." *Commonwealth v. Gray,* 441 Pa. 91, 94, 271 A. 2d 486 (1970) ; *Commonwealth v. Hornberger,* 441 Pa. 57, 270 A. 2d 195 (1970). Of course, the record must be considered and read in the light most favorable to the Commonwealth. *Commonwealth v. Rankin,* 441 Pa. 401, 272 A. 2d 886 (1971).

In this regard, it is well to note the differences between appellant's version as contained in his pretrial statement to the police and appellant's version as contained in his trial testimony. In his confession, appellant admitted that he turned himself in at the police station, "to turn in that I shot a man." He then proceeded to give the following account of the events surrounding the killing: "A. I got up and sat on the side of the bed. Miller had left. The longer [the deceased] sat the more he said that he would kill me and his brother, Ernest Roy Louden. I laid down with no covers on but I was awake. This is not the first occurrence that this has happened. He walked back into the kitchen again and sat at the table. I have three chairs over there. Then he started this procedure about killing my uncle and me. Q. Did he have the gun at this time? A. He had picked up the gun. It was in the corner by my bed. I had three splatter loads and one pumpkin ball. They were on the floor. I thought he loaded the gun as I heard a click. At

this time I was setting up and he came over towards me and pointed the gun at me. I grabbed the barrel of the gun and turned it around and *pointed the gun at him*. (Emphasis supplied.) Q. Did you have the gun pointed at him direct? A. When I grabbed the gun and turned it around I had the gun pointed more over his head than directly at him. Q. What took place then? A. He pushed me and I fell down on the floor right by the bed and my head hit the bed. The gun went off. As soon as the gun went off, he fell. I think that I threw the gun on the bed."

At his trial, his account of the events was somewhat different: "A. . . . I immediately got out of bed and started out toward him. As it shows on the diagram here, when I got to the refrigerator, I saw he had the gun, he was in the chair, he was getting out of the chair, which is the arm chair, a padded arm chair. . . . A. When I came out, I had two choices. One choice would be to take a chance to get out the door, which opened inwardly, he was getting out of the chair with the gun which he had in his left hand, but he was getting out, and I definitely knew I didn't have any chance to get through the door before he actually shot me, like I said, I didn't doubt it a bit, and I wouldn't have had any chance to get out. And the other choice, then, would be trying to talk him out of it as I did in the past, and when he got out of the chair he stepped to the right, his right, of the chair. . . . A. Well, he was in the chair, he was getting up, and he took a step to the right of the chair, with the gun pointed at me, but he was sort of weaving. . . . A. [The deceased] got out of the chair and, as I said, he stepped to the right, but he had the gun on me, like I said, he was standing there with the gun on me, and I immediately grabbed the barrel, here (indicating), real quick, I grabbed it and pointed the gun up in the air, and when he gave

me the push, my arm went out like this (indicating), I dropped my arm to catch myself, and the weight of the gun, I presume, or my own weight, it could have been the weight of the gun, when I come down, it was cocked and it went off. I fell backward, I don't know whether it struck me, like the stock or something, but I lost my balance and fell, and my head hit the bed."

Thus, in his confession, unlike his testimony, appellant admitted pointing the gun at the deceased. Furthermore, the Commonwealth's expert pathologist testified that the path of the fatal bullet established that it entered the body at a downward flight, rebutting appellant's testimony that the gun discharged while appellant was in the act of falling. The jury obviously believed that the account contained in appellant's pretrial confession was closer to what actually occurred. Appellant's admission that he fired the fatal shot, after pointing the gun at the victim, when coupled with the pathologist's testimony clearly constituted sufficient evidence to support a conviction of second-degree murder.

Appellant argues that his confession, similar to but more damaging than his direct testimony, should not have been admitted into evidence because it was involuntary.[1] The facts surrounding the confession are as follows:

Following the shooting, appellant was driven to the Duncannon State Police Barracks by a neighbor. Upon entering the station, appellant was asked by the

---

[1] A pretrial motion to suppress the confession was not filed; therefore, appellant could have been held to have waived this objection. Pennsylvania Rules of Criminal Procedure 323-24. The trial judge, however, permitted an evidentiary hearing outside the presence of the jury and concluded that (1) the appellant's confession was voluntary and (2) appellant had not been denied the assistance of counsel.

trooper on duty whether he could be of assistance. Appellant replied, "I just shot my Uncle Ed."[2] The trooper directed no further questions to appellant but notified another trooper to return to the barracks. Trooper Montross testified that, upon receiving the radio communication, he returned to the barracks and immediately gave appellant the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). Again, no further questioning was initiated until one officer Corbett arrived, whereupon appellant was again informed of his rights. Upon being told of his right to have an attorney present during any questioning, appellant mentioned the name of an attorney. Officer Corbett attempted to locate the attorney, but was told by appellant not to bother, that appellant would answer any questions.[3] Prior to initiating the questioning, appellant was read the waiver of his rights. Inquiry was made as to whether he understood the waiver, to which appellant answered in the affirmative; whereupon he then signed it. The questioning was then initiated and the statement copied by Officer Corbett, typed, read by appellant, re-read to appellant by Officer Corbett and finally signed by appellant on each page. On its face, the evidence exhibited a knowing and intelligent waiver of appellant's constitutional rights. Cf., *Commonwealth v. Goldsmith*, 438 Pa. 83, 263 A. 2d 322 (1970). Appellant contends, however, that the statement was not voluntary since at the time it was given he was under the influence of medication.

---

[2] There is no question that appellant's initial statement to the police that "I just shot my Uncle Ed" was volunteered and, therefore, clearly admissible without the prescribed *Miranda* warnings. See, e.g., *Commonwealth v. Eperjesi*, 423 Pa. 455, 224 A. 2d 216 (1966).

[3] Thus distinguishing this case from *Commonwealth v. Nathan*, 445 Pa. 470, 285 A. 2d 175 (1971), there being no evidence that defendant was "tricked or cajoled" into waiving his right to counsel.

The testimony of the state troopers and one Lester Kumler, who accompanied appellant to the police station, was that appellant acted normally at all times, his gait was steady and his speech was not slurred. The trial judge elected to believe this testimony. We conclude that the court's finding of voluntariness is supported by a preponderance of the credible evidence.

Although appellant's statement is constitutionally admissible and the evidence was sufficient to support the verdict, we believe that appellant has identified errors in the court's charge which entitle him to a new trial.

In its charge to the jury, the court gave the following instructions concerning appellant's right of self-defense in his own home: "In the home, *if you retreat about as far as you can retreat, and there is really no place further to go,* the law says you have a right to defend yourself in the home, where that may not exist out in the open where you can certainly get away." (Emphasis added.) The court's instruction was clearly an incorrect statement of the law. Where a man is dangerously assaulted in his own dwelling house by one not a member of the household, there exists no duty to retreat; rather, he may stand his ground and meet deadly force with deadly force to save his life or to protect himself from serious bodily harm. E.g., *Commonwealth v. Wilkes,* 414 Pa. 246, 199 A. 2d 411, *cert. denied,* 379 U.S. 939, 85 S. Ct. 344 (1964); *Commonwealth v. Fraser,* 369 Pa. 273, 85 A. 2d 126 (1952). No objection was made to this charge, but the issue was raised in post-trial motions.

The fact that appellant's trial counsel failed to make any objection to this charge does not deprive him of his right to have the alleged error considered on appeal if it constitutes "basic and fundamental error." *Commonwealth v. Jennings,* 442 Pa. 18, 274 A. 2d 767

(1971). It has been said that our basic and fundamental error test is "too vague and lends itself to inconsistent results." See Justice ROBERTS' dissenting opinion in *Commonwealth v. Williams,* 432 Pa. 557, 570, 248 A. 2d 301, 308 (1968). While we have treated each case on its facts, we have said that alleged error in a charge, to which no objection was made, would only be considered on appeal where "it affects the merits or justice of the case or, as some cases express it, offends against the fundamentals of a fair and impartial trial." *Commonwealth v. Jennings, supra,* at page 25. It must be the type of erroneous charge which, if studiously followed by a jury, would prevent that jury from reaching a verdict favorable to a defendant, even if they believed the defendant's version of the alleged crime and the defendant's version, under the law, constituted a recognizable defense to the Commonwealth's accusation, or at least required a verdict of a lower degree of homicide than that actually reached.

The significance given to a trial counsel's failure to object to such an erroneous charge should be the same given to any review of the conduct of a defendant's trial counsel, when the defendant later alleges that his counsel was ineffective. Thus, only if counsel's failure to object "had some reasonable basis designed to effectuate his client's interests," *Com. ex rel. Washington v. Maroney,* 427 Pa. 599, at 604, 235 A. 2d 349 (1967), can the defendant be barred from raising the alleged error on appeal. It is conceivable that when the trial court gives an erroneous charge on a tangential issue, a trial counsel might refrain from objecting so as not to emphasize certain issues in the jury's mind at the expense of others which he deems more crucial. However, when the court charges erroneously on an issue, and the defense case is abso-

lutely dependent upon the jury's correct understanding of that issue, there can be no reasonable basis for defense counsel's failure to object. Such an error we consider "basic and fundamental," and to insure that the defendant received the fair trial to which he is entitled, we will consider the alleged error on appeal, even in the absence of an objection by his counsel.

Were we not to consider allegations of "basic and fundamental" error on appeal because counsel failed to make objections at trial, we would be requiring a defendant to file a post-conviction petition alleging ineffective representation if he wished to have the alleged error considered. In such case, a post-conviction hearing would be required, possibly followed by a second appeal, thereby requiring a two-step consideration of the question which could just as easily be determined in the format of the first appeal. Such a procedure would, in our view, be wholly unwarranted and inconsistent with our desire to conserve already scarce judicial resources.

Considering the facts of this case, the court's erroneous charge on appellant's right of self-defense in his own home, must be considered "basic and fundamental" error. For, if the jury believed the version contained in appellant's trial testimony, but diligently followed the court's charge that the appellant had the responsibility, even in his own home, to "retreat as far as [he] can retreat," they might well have found appellant guilty because he risked a struggle with the decedent rather than retreating from his home. Consequently, appellant is entitled to a new trial.

Another error contained in the court's charge is also sufficient to entitle appellant to a new trial. On the definition of voluntary manslaughter, the court charged as follows:

"So, if you find an unlawful killing, to make a wound that would result in death, to be voluntary man-

slaughter, there must be sufficient cause or provocation or extenuating circumstances such as rage or passion, but without the intent at the time to kill,[4] under circumstances where an individual goes beyond the control of his reason sufficient to impel him to do this deed. For example, if the man of the house comes home and finds his wife in bed with another man, if under the heat of passion he kills him voluntarily, that, members of the jury, is voluntary manslaughter.

"Passion means any of the emotions of the mind, such as anger, rage, resentment, terror, rendering the mind incapable of cool reflection or deafening it to the voice of reason."

Although this charge includes a correct definition of the legal passion necessary to negate a finding of malice, thereby reducing what would otherwise be murder to manslaughter, "any of the emotions of the mind such as anger, rage, resentment, terror, rendering the mind incapable of cool reflection or deafening it to the voice of reason," the example given, the passion of a cuckolded husband, has no relation to this case. The court then went on to say: "We tell you about voluntary manslaughter in this case because that is a question for you to consider. In our opinion, members of the jury, there may be a question of whether or not there was any evidence of such passion as would reduce this offense to voluntary manslaughter, which would cause you to find a verdict of guilty of voluntary manslaughter. This is only our opinion and is not binding on you. If you wish to bring in that verdict in this case, you have the right to do so, the Court may not say to you, 'Do not.' "

---

[4] This statement is erroneous. The court was obviously confusing malice, which is absent in a case of voluntary manslaughter, with a specific intent to kill, which is always present in such a case.

Even if such a comment, if fairly based on the evidence, is still permissible despite our recent decisions in *Commonwealth v. Archambault,* 448 Pa. 90, 290 A. 2d 72 (1972), and *Commonwealth v. Motley,* 448 Pa. 110, 289 A. 2d 724 (1972), the judge's charge, particularly the example he gave of "legal passion," indicates that the court's comment was not fairly based on the record. An examination of this record indicates that if the appellant had any emotion constituting "legal passion" which would negate the presence of malice, assuming the killing was not accidental or excusable as self-defense, that emotion was "fear."

Appellant testified that the decedent was holding a gun on him when he grabbed the barrel. He also testified that he was "deathly afraid" of the decedent, who was a much larger man than he was and who had, in fact, previously made threats to kill him. Even if the jury did not believe that appellant was in any real danger from the decedent at the time of the shooting, if the jury believed that the appellant was actually in fear of his life, they would have been justified in returning a verdict of voluntary manslaughter. In *Commonwealth v. Broeckey,* 364 Pa. 368, 72 A. 2d 134 (1950), we said, quoting from *Commonwealth v. Colandro,* 231 Pa. 343, 352, 80 A. 571 (1911): " '. . . If the circumstances are both adequate to raise and sufficient to justify a belief in the necessity to take life in order to save one's self from [imminent peril to life or great bodily harm], where the belief exists and is acted upon, the homicide is excusable upon the theory of self defense . . . ; while, if the act is committed under the influence of an uncontrollable fear of death or great bodily harm, caused by circumstances, but without the presence of all the ingredients necessary to excuse the act on the ground of self defense, the killing is manslaughter.' See also Commonwealth v. Principatti, 260 Pa. 587, 596, 104 A.

53; Commonwealth v. Miller, 313 Pa. 567, 569, 170 A. 128." At page 373.

Since this case must be tried again, we have considered appellant's contention that the court below abused its discretion by permitting the introduction of photographs of the deceased after the fatal shooting. We find nothing inflammatory in the admitted photographs. They were black and white and the deceased's wounds were not visible in the photographs. The purpose of the photographs was to show the location of the body with respect to certain items of furniture in order to refute appellant's statements concerning the events which led to the shooting. The photographs were neither so inflammatory nor so unnecessary as to be inadmissible. E.g., *Commonwealth v. Collins*, 440 Pa. 368, 269 A. 2d 882 (1970).

We find it unnecessary to consider the other issues raised by appellant in view of our disposition of this case.

Judgment of sentence reversed and case remanded for new trial.

Mr. Justice EAGEN and Mr. Justice POMEROY concur in the result.

Former Mr. Chief Justice BELL and former Mr. Justice BARBIERI took no part in the consideration or decision of this case.

———

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I dissent because the verdict of second degree murder is fully supported by the record. The appellant's testimony, if believed, entitled him to an acquittal on the grounds of accidental homicide. The jury was properly so instructed and chose not to accept his version of the shooting.

Mr. Chief Justice JONES joins in this dissent.