362 A.2d 217

**COMMONWEALTH of Pennsylvania**

v.

**Henry R. GADDY, Appellant (two cases).**

Supreme Court of Pennsylvania.

Argued June 23, 1976.

Decided July 6, 1976.

Rehearing Denied July 28, 1976.

304

306

Gene D. Cohen, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., James Garrett, Philadelphia, for appellee.

308 

Before JONES, C. J., and EAGEN, O'BRIEN, ROB-
ERTS, POMEROY, NIX and MANDERINO, JJ.

OPINION

POMEROY, Justice.

This is an appeal from the judgments of sentence im-
posed upon appellant, Henry R. Gaddy, following his con-
viction by a jury [1] of murder in the first degree and ag-
gravated robbery [2] and the denial of his post-verdict
motions.[3] The charges arose from the robbery-murder
of one Martin Dobkin in his small grocery store in the
City of Philadelphia on January 7, 1972. Appellant con-
tends that he is entitled to a new trial because of seven
errors allegedly committed by the trial court during the
course of his trial. We do not agree, and affirm the
judgments of sentence.

 A review of the evidence will be helpful to an un-
derstanding of the specific errors asserted by appellant.
It will at the same time show that there was sufficient
evidence to support a finding of murder in the first
degree.[4]

The principal evidence implicating Henry Gaddy in the
slaying came from one LeRoy Barnes. Barnes testified
that in late December, 1971, he and the appellant were
first approached by one Nathaniel Odom with the idea of

1. A previous trial had resulted in a hung jury.

2. Appellant was sentenced to life imprisonment for murder and
not less than ten years nor more than twenty years for robbery.
The sentences are to run concurrently.

3. The appeal of the judgment on the homicide conviction was
taken directly to this Court pursuant to the Act of July 31, 1970,
P.L. 673, No. 223, Art. II, § 202, 17 P.S. § 211.202(1) (Supp.1975–
76); that on the robbery charge was initially taken to the Superi-
or Court, which certified the appeal to this Court in order that
the two appeals might be heard together in the interests of judi-
cial economy.

4. This determination is mandated by the Act of February 15,
1870, P.L. 15, § 2, 19 P.S. § 1187.

robbing Martin Dobkin's store, the Green Front Market. Barnes stated that while he himself expressed some reluctance to go along, Gaddy immediately agreed to the proposal. Nothing came of the plan, however, until January 7, 1972, when Gaddy and Odom finally persuaded Barnes to accompany them on their misadventure. That day they met at Odom's house; Odom produced a loaded .32 caliber revolver which he indicated to the others he was taking with him on the robbery.

At about 5:00 p. m., Odom, Barnes and Gaddy left the house and went to a bar across the street from Martin Dobkin's market. Through a window in the bar door they were able to observe the comings and goings of persons to and from the store. At approximately 6:00 p. m., satisfied that no shoppers remained in the store,[5] the three men moved across the street and entered the store. Inside the storeroom, Gaddy and Barnes placed themselves near the checkout counter, where Dobkin was standing, while Odom moved throughout the store removing various items from the shelves. Odom then came to the counter with his "purchases" and began fumbling in his pockets as though looking for money. Instead of money, however, he withdrew the revolver from his pocket and fired two shots at Dobkin, who fell to the floor clutching his stomach. Odom then leaned over the counter and fired two more shots. Dobkin subsequently died of a gunshot wound to the head.

After the shooting, Gaddy and Odom went behind the counter and rummaged through the victim's pockets and the cash register. Taking what money was there, Odom, Barnes and Gaddy fled from the store and ran to the house of one Marva Brown. Miss Brown was the girl

5. Unknown to the robbers at the time, one Harry Coleman, a friend and part-time employee of Dobkin's, remained in the store. He observed the incident and his testimony at trial was consistent with Barnes'. Due to poor eyesight, however, Coleman was unable to identify specifically the participants in the robbery-murder.

friend of Odom's brother. At her home, they divided the proceeds of the robbery among themselves: $25 to LeRoy Barnes; $85 to Nathaniel Odom; and $85 to Henry Gaddy. Barnes was the first of the three to be arrested, approximately a month and a half after the incident. He confessed his part in the episode and implicated the others.

We have no hesitancy in concluding that the evidence was sufficient to prove beyond a reasonable doubt that Gaddy was guilty of murder in the first degree on a theory of felony-murder.[6] See *Commonwealth v. Ilgenfritz,* 466 Pa. 345, 353 A.2d 387 (1976); *Commonwealth v. Green,* 464 Pa. 557, 347 A.2d 682 (1975).

We now turn to consideration of appellant's assignments of error. Four of them relate to the testimony of LeRoy Barnes, the principal Commonwealth witness; one relates to testimony of the victim's widow; and two relate to the charge of the court.

▬ (1) The first error Gaddy advances is that the trial court abused its discretion in limiting defense counsel in his cross-examination of Barnes concerning his use of drugs. When counsel asked Barnes, "Do you take drugs, Mr. Barnes"? the attorney for the Commonwealth objected. The court ruled that counsel could ask Barnes about his use of drugs on the day of the robbery on the theory that such questioning was proper to elicit whether by the use of drugs Barnes' powers of observation had been impaired, but the objection was sustained insofar as the question sought to attack the credibility of Barnes generally. Appellant advances the view that this wider scope of inquiry in the area of drug use should have been permitted and refers us to the case of *Commonwealth v. Dreibelbis,* 217 Pa.Super.Ct. 257, 269 A.2d 387 (1970), in support of that position.

---

6. Act of June 24, 1939, P.L. 872, § 701, as amended, 18 P.S. § 4701, repealed, Act of December 6, 1972, P.L. 1482, No. 334, § 5.

Appellant would have us read *Dreibelbis* too broadly. In *Dreibelbis,* the Superior Court held that it was proper, on cross-examination of an accomplice of the defendant, to question him with respect to his use of drugs on the day of the crime. The court's rationale was that such questioning " 'was unobjectionable because it was asked for the purpose of attacking the credibility of the witness by showing that at the time of the event to which he testified his powers of observation and memory were impaired, so that his recollection and account of the experience might be inaccurate.' " 217 Pa.Super.Ct. at 260–61, 269 A.2d at 389, quoting *Commonwealth v. Morrison,* 157 Pa.Super.Ct. 366, 43 A.2d 400 (1945).[7] By so holding, the court carved out a limited exception to the general rule set down in *Commonwealth v. Payne,* 205 Pa. 101, 54 A. 489 (1903) that defense counsel may not inquire into the general reputation of a witness for the Commonwealth.

■■■■ We are of the opinion that the testimony which defense counsel sought to elicit from Barnes in the case at bar was designed merely to blacken his reputation and as such was inadmissible. See *e. g., Commonwealth v. Katchmer,* 453 Pa. 461, 309 A.2d 591 (1973) and the cases cited therein. Evidence of prior misconduct unrelated to the issues at trial is admissible only insofar as it bears directly on the witness' *"character for truth."* (emphasis in original) 3A Wigmore, Evidence, § 922, at 726 (Chadbourn rev. 1970). See also *Downey v. Weston,* 451 Pa. 259, 301 A.2d 635 (1973). General questioning concerning the use of drugs does not bear on the witness "character for truth". Testimony of that sort serves only to interject an extraneous issue into the trial, thereby diverting the jury from its principal duty

7. This is consistent with the rule espoused by Dean Wigmore in his treatise. 3A Wigmore, Evidence, §§ 931, 934 at 758, 762 (Chadbourn rev. 1970).

——the determination of the guilt or innocence of the accused.[8]

■■ (2) The second issue raised by appellant also relates to Barnes' drug use. Gaddy contends that the trial court abused its discretion in refusing to permit him to introduce into evidence testimony by Dr. Nicholas Frignito, a court-appointed psychiatrist. Dr. Frignito had examined Barnes when Barnes had been arrested on an unrelated charge, shortly before his arrest for the robbery-murder of Martin Dobkin. Dr. Frignito's testimony was admissible, appellant argues, because it was directed to the issue of Barnes' reliability, *i. e.*, his capacity for truth and veracity.[9] Evidence as to the witness' general reputation for truth and veracity is admissible. Henry, Pennsylvania Evidence, § 804 at 260 (4th ed. 1953). We have apparently not been previously confronted with the question whether psychiatric evidence on this issue is admissible. See and compare *Commonwealth v. Kosh*, 305 Pa. 146, 157 A. 479 (1931); *Commonwealth v. Towber*, 190 Pa.Super.Ct. 93, 152 A.2d 917 (1959). We do not reach that question today, however, for we conclude that Dr. Frignito's testimony was inadmissible for another reason.

The proposed testimony shows that the doctor was able to give an opinion, which was negative, only as to

8. In the present case, defense counsel was permitted to ask Barnes whether he had taken any drugs within 24 hours of the robbery. Barnes initially responded that he had, but further cross-examination elicited the fact that he had taken an unspecified amount of heroin more than 30 hours before the incident, on the morning of January 6, 1972, and that he had not taken any drugs on the day in question. Thus, it is apparent that the jury in fact was made aware that Barnes had been a drug user and that he had used drugs some hours before the killing of Dobkin.

9. No formal offer of proof was made as to Dr. Frignito's proposed testimony. It was stipulated, however, that his testimony would be the same as that proffered at an *in camera* conference at appellant's first trial but not there admitted. The record before us contains that testimony.

Barnes' truthfulness concerning his use of drugs, not his general truthfulness or lack thereof. As with the cross-examination of Barnes himself as to his use of drugs, such evidence would serve only to introduce a collateral issue into the trial. For that reason, the trial court's refusal to permit Dr. Frignito to testify was not error.

(3) The next allegation of error concerns the trial court's failure to direct the Commonwealth to correct a "false" statement supposedly made by LeRoy Barnes while he was being cross-examined by the defense. The statement was in regard to the closeness of the relationship between Gaddy, the defendant, and Nathaniel Odom. Appellant argues that Barnes committed perjury when he testified that he saw Gaddy and Odom together "just about every day" prior to December 15, 1971,[10] because,

10. The relevant portion of the testimony is as follows:

"Q. You testified on direct testimony that you saw Nathaniel Odom and Henry Gaddy every day; is that correct?
A. Right.
Q. Did you see them on December 25, 1971? That's Christmas Day.
A. Yes, I think I did see him Christmas.
Q. Did you see them on December 24, 1971?
A. Yes.
Q. That was the day before Christmas?
A. Right.
Q. Did you see them on December 15, 1971 together? That was ten days before.
A. I may have seen them that day.
Q. You may have seen them?
A. Right.
Q. Do you remember seeing them during the month of December together?
A. I can't remember all the way back then.
Q. Can you remember seeing them in November of 1971?
A. Yes.
Q. Together just about every day?
A. Right.
Q. How about October in 1971? Did you see them every day?
A. Well, like I said—

according to court records he produced, Henry Gaddy had been committed to the State Correctional Institution at Camp Hill, Pa. between November 13, 1969 and December 13, 1971. Appellant asserts, furthermore, that the assistant district attorney was aware of Barnes' perjurious testimony.

■■ There is no doubt that a prosecuting attorney has an affirmative duty to correct testimony given by a Commonwealth witness and which the prosecutor knows to be false. See *Commonwealth v. Moehring*, 445 Pa. 400, 285 A.2d 487 (1971); *Napue v. Illinois*, 360 U.S. 364, 3 L.Ed.2d 1217, 79 S.Ct. 1173 (1959); A.B.A. Standards Relating to the Prosecution Function, § 3.11. But it is not at all clear that in fact Barnes gave false testimony. His answers as to when he recalled seeing Odom and Gaddy together prior to December 24, 1971 were permeated with uncertainty. When asked by defense counsel whether he would be surprised to learn that Mr.

Q. That was two months before. Let me help you out.

MR. CANNON: Object, your Honor. He asked the question. Let the witness answer the question before he poses another question.

THE COURT: Can you answer? Do you recall?

THE WITNESS: Right. Like I said, anytime I seen them, they was together.

Q. Did you see them in August of 1971 together, the summer?

A. That's going back kind of far. I can't remember back then.

Q. Well did you see them starting from December or January 1972, going back say two years, did you see them every day, about every day?

A. Whenever they would be together, yes, I would see them.

Q. You would see them a lot?

A. Right.

Q. Would it surprise you, Mr. Barnes, if I told you that Mr. Gaddy had been out of town for three years prior to December of 1971?

A. No, it wouldn't surprise me.

Q. But you saw them every day together?

A. Right."

Gaddy had been out of town for three years prior to December 1971, Barnes responded, "[n]o, it wouldn't surprise me." We accept the Commonwealth's appraisal of the challenged testimony: "It is obvious from Barnes' testimony that at best he did not clearly remember whether he had seen Gaddy during that time and that at worst he might be mistaken about it." Appellee's Brief at 13. *Cf. Commonwealth v. Sweeney,* 464 Pa. 425, 347 A.2d 286, 289 (1975). Furthermore, even assuming that Barnes' testimony can somehow be characterized as "false", there is no indication in the record that the assistant district attorney had knowledge of such falsity. There is no showing, other than appellant's assertion, that the assistant district attorney was aware of the exact dates of Gaddy's confinement at Camp Hill or whether those dates coincided with Barnes' testimony as to when he had observed Odom and Gaddy together. *Cf. Commonwealth v. Moehring,* supra; *Commonwealth v. Jennings,* 446 Pa. 294, 285 A.2d 143 (1971).

 (4) Appellant's fourth assignment of error concerns the admission into evidence of a statement given to the police by LeRoy Barnes following his arrest. The statement in its entirety was read to the jury by the police officer to whom it had been given. In the statement, which was generally consistent with his testimony, Barnes admitted his participation in the robbery-murder and implicated Odom and Gaddy as well. The reading of the statement was permitted because on cross-examination of Barnes, defense counsel had sought to convey the impression that Barnes' motivation for testifying was to obtain favorable treatment for himself in his own case.[11] Before the statement was read, the trial judge cautioned the jury that the statement was being read into evidence

11. The favorable treatment which Barnes allegedly received was decertification back to the juvenile court (Barnes had been 15 years of age at the time of the homicide) and release on nominal bail.

solely for the purpose of showing that his testimony at trial was not a fabrication of recent origin and did not spring from corrupt motives. Both then and during his charge the judge instructed the jury that they were *not* to consider the statement as substantive evidence of Gaddy's guilt.

Under the circumstances, we find no error in admitting Barnes' prior consistent statement. In *Commonwealth v. Wilson*, 394 Pa. 588, 602–03, 148 A.2d 234, 242 (1959), *cert. denied*, 361 U.S. 844, 80 S.Ct. 97, 4 L. Ed.2d 82 (1959), we stated the applicable law as follows:

> "As a general rule a statement made by a witness at one time, while admissible to contradict him, is not competent to corroborate or substantiate his present testimony. Were it otherwise, the door might be opened to the fabrication of evidence. However, there are certain well-recognized exceptions to this general rule: prior declarations of a witness, which are consistent with his present testimony, may be admissible to corroborate his present testimony if it be alleged that the witness' present testimony is recently fabricated, or if it be claimed that the witness is testifying from corrupt motives.
>
> "Evidence of consonant statements, if admissible, are admissible only in rebuttal and then only for the purpose of showing that that which the witness now testifies to has not been recently fabricated and not for the purpose of proving the truth of the present testimony." (footnote omitted).

See also *Commonwealth v. Ravenell*, 448 Pa. 162, 292 A. 2d 365 (1972); *Commonwealth v. Carr*, 436 Pa. 124, 259 A.2d 165 (1969); *Commonwealth v. Vento*, 410 Pa. 350, 189 A.2d 161 (1963); *Commonwealth v. Whyatt*, 235 Pa.Super. 211, 340 A.2d 871 (1975); McCormick, Evidence, § 49 at 105 (Cleary ed. 1972). Barnes' prior consistent statement clearly fell within the exception sanc-

tioned in our cases, for it was made before any corrupt motive had arisen, *i. e.,* before Barnes could have known that he would be granted favorable treatment in exchange for his testimony against Gaddy. *Commonwealth v. Cooper,* 230 Pa.Super. 204, 327 A.2d 177 (1974). Furthermore, the trial judge's admonition to the jury, reiterated in the charge, made clear to the jury the limited purpose for which the evidence was being received. *Commonwealth v. Wilson,* supra.

(5) Appellant next complains that the trial court erred in permitting Mrs. Martin Dobkin to testify that she had been married to the victim and to identify a photograph of him.[12] When the district attorney announced his intention to call Mrs. Dobkin as a witness, defense counsel objected on the ground that her testimony would be inflammatory[13] (Mrs. Dobkin had apparently broken into tears during the course of her testimony at appellant's first trial) and offered to stipulate as to her testimony. The objection was overruled and the prosecutor rejected the offer to stipulate. Mrs. Dobkin then testified and, after she identified the photograph, was led weeping from the witness stand.

We have considered a similar situation recently in the case of *Commonwealth v. Evans,* 465 Pa. 12, 348 A.2d 92 (1975). In *Evans,* as here, the defendant believed that the witness, a daughter of the victim, might break down during the course of her testimony, thereby inflaming the minds of the jurors against the defendant. Counsel in *Evans* offered, as did counsel here, to stipulate to the relative's testimony. We found no error in

12. The photograph was taken post-mortem when the deceased's body was in the morgue. There is no claim, however, that the picture was gruesome or inflammatory or irrelevant.

13. No objection was made as to the relevance of the testimony Mrs. Dobkin would give.

the fact that the trial court refused to compel the prosecutor to stipulate. As we there stated:

> "The general rule is that a party to an adversary court litigation may prove his case by proper evidence and may not be required to accept, in lieu of such evidence, a stipulation as to what it would prove. 31 C.J.S. Evidence § 299 at 1068. We see no reason to deviate from that rule in this case. The Commonwealth has the burden of proving the guilt of the defendant beyond a reasonable doubt; it must be permitted to do that by whatever material evidence it can muster. See *Commonwealth v. Sullivan*, 446 Pa. 419, 437, 286 A.2d 898, 905 (1971) (Opinion in Support of Affirmance); *Commonwealth v. Wendt*, 258 Pa. 325, 102 A. 27 (1917). See also *United States v. Brickey*, 426 F.2d 680, 686 (8th Cir. 1970)." *Id.* at 17, 348 A.2d at 94–95.

Our ruling in *Evans* is controlling in the present case.

(6) Appellant's final assignment of error concerns the charge to the jury.[14] The trial judge, after telling the jury that they could find the defendant guilty of voluntary manslaughter if they found that the killing was done in the heat of passion and in response to adequate provocation, told them, "I don't see any of those facts in this case at all."[15] Defense counsel's timely

14. Appellant also objects to the court's statement in its charge that the testimony of LeRoy Barnes was corroborated in part by the testimony of another witness. This objection, however, has been waived by failure to make any objection to the claimed inaccuracy following the charge, as required by Rule 1119(b) of the Pennsylvania Rules of Criminal Procedure, 19 P.S. (1975 Pamphlet). See *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974).

15. At the time of appellant's trial, in May, 1973, the trial judge was not required to charge on voluntary manslaughter if in his view no evidence existed in the record which would support such a verdict. See *e. g., Commonwealth v. Mathews*, 446 Pa. 65, 285 A.2d 510 (1971). In *Commonwealth v. Jones*, 457 Pa. 563, 319 A. 2d 142 (1974), *cert. denied*, 419 U.S. 1000, 95 S.Ct. 316, 42 L.Ed.2d 274 (1974), a majority of this Court, although for different rea-

objection was overruled. We have reviewed the evidence and agree with the trial judge that there was no evidence to suggest that the killing was committed in the heat of passion or in response to adequate legal provocation. We therefore conclude that his comment to the jury was justified. *Cf. Commonwealth v. McNeill,* 462 Pa. 450, 341 A.2d 463 (1975); *Commonwealth v. Bailey,* 450 Pa. 201, 299 A.2d 298 (1973).

We believe that our consideration of this issue is controlled by our decision in *Commonwealth v. Yount,* 455 Pa. 303, 314 A.2d 242 (1974). In *Yount,* as here, the claim was made that the trial judge improperly expressed his opinion that the evidence did not warrant the jury in returning a verdict of voluntary manslaughter. We rejected the contention that such a comment constituted reversible error, stating

"The trial court expressed the view that if the jury found that appellant did in fact maliciously kill decedent, the court recalled no evidence of extenuating circumstances which would reduce the act to voluntary manslaughter. The court, however, also gave the jurors a full, complete, adequate, and correct charge on voluntary manslaughter, and instructed them that voluntary manslaughter was an entirely permissible verdict. The trial judge also specifically instructed the jurors that their recollection of the testimony, and not his, controlled, that his opinion was no more than a gratuitous observation, and that the jury could and should return any verdict it felt justified. Moreover, the court did not express an opinion as to guilt or innocence or suggest that the jury return any particular verdict. The charge, read in its entirety, removed nothing from the province of the jury nor did it con-

sons, held that a defendant, upon request, was entitled to a charge on voluntary manslaughter even absent such evidence. See also *U. S. ex rel. Mathews v. Johnson,* 503 F.2d 339 (3d Cir. 1974), *cert. denied sub nom., Cuyler v. Mathews,* 420 U.S. 952, 95 S.Ct. 1336, 43 L.Ed.2d 430 (1975).

tain any judicial expression of guilt. The charge therefore was proper. *Commonwealth v. Archambault,* 448 Pa. 90, 290 A.2d 72 (1972); *Commonwealth v. Motley,* 448 Pa. 110, 289 A.2d 724 (1972); see *Commonwealth v. Miller,* 448 Pa. 114, 124–26, 290 A.2d 62, 67–68 (1972)." *Id.* at 319, 314 A.2d at 251.

See *Commonwealth v. Russell,* 459 Pa. 413, 326 A.2d 303, 308 (1974); *Commonwealth v. Chester,* 410 Pa. 45, 188 A.2d 323 (1963). See also Laub, Pa. Trial Guide, § 618.-5, quoted with approval in *Commonwealth v. Mathews,* 446 Pa. 65, 78, 285 A.2d 510 (1971) (dissenting opinion of this writer, joined by Mr. Justice Roberts). Taking the instant charge as a whole, we are of the opinion that it is indistinguishable from *Yount.* While informing the jury that in his opinion no facts existed to support a verdict of voluntary manslaughter, the trial court fully informed the jury of its ability to return such a verdict; specifically told them that only their recollection of the facts controlled; and stated that they were the sole finders of facts. Such a circumscribed statement cannot be said to have impermissibly infringed upon the jury's function. See *American Bar Association Standards Relating to Trial by Jury,* § 4.7 (Approved Draft, 1968).

Judgments of sentence affirmed.

EAGEN, J., concurs in the result.

ROBERTS, J., filed a dissenting opinion in which NIX and MANDERINO, JJ., join.

ROBERTS, Justice (dissenting).

I dissent. The majority today holds that the Commonwealth can, over objection, call a witness whose testimony is completely unnecessary, can use a photograph of her deceased husband to prompt her to tears, and can do so knowing that she has reacted in precisely the same way at a former trial. This does not comport with my understanding of a fair and orderly trial.

At trial appellant objected to the proposed use of decedent's wife's testimony when she was called as a witness on the ground that it would be inflammatory. Factually, he based the objection on the events of an earlier trial at which she had "broken down" on the witness stand.

When inflammatory evidence is challenged, the decision whether to admit it must be made by weighing its probative value against its potential for prejudicing the jury. See, e. g., *Commonwealth v. Powell*, 428 Pa. 275, 241 A.2d 119 (1968); *Shepard v. United States*, 290 U.S. 96, 104, 54 S.Ct. 22, 25–26, 78 L.Ed. 196 (1933); *Smith v. Spina*, 477 F.2d 1140, 1146 (3d Cir. 1973); *Bowers v. Garfield*, 382 F.Supp. 503, 510 (E.D.Pa.) aff'd, 503 F.2d 1398 (1974). Professor McCormick states:

> "Relevant evidence . . . is evidence that in some degree advances the inquiry, and thus has probative value, and is prima facie admissible. But relevancy is not enough. There may remain the question, is its value worth what it costs? There are several counterbalancing factors which may move the court to exclude relevant evidence if they outweigh its probative value. In order of their importance, they are these. First the danger that the facts offered may unduly arouse the jury's emotions of prejudice, hostility or sympathy."

McCormick, Evidence § 185, at 438–39 (1972).

There can be no doubt in this case that the sight of decedent's widow weeping on the witness stand could inflame the jury. Therefore, once the objection that her testimony might be inflammatory was made, the trial court was obligated to weigh the probative value of the evidence against its potential for prejudice. That weighing was clearly not done in this case because the evidence obtained from decedent's widow was cumulative and had virtually no probative value. Before decedent's widow was called as a witness, the Commonwealth had called a co-defendant whose testimony indicated that decedent was alive prior to the killing. Moreover, this testimony

was "corroborated by a friend of [decedent], Harry Coleman, who was present in the store during the robbery and described its occurrence like Barnes." Brief for Commonwealth at 4. The testimony of these two witnesses was sufficient to establish, if necessary, that decedent was alive before he was killed by the three men who robbed him.

The only justification offered by the Commonwealth for calling decedent's widow was "to establish the life in being of her husband prior to the crime." Brief for Commonwealth at 16. Moreover, the Commonwealth claims in its brief that she was the only available person who could testify for this purpose, apparently forgetting its own witness, Harry Coleman, a friend of decedent who could identify him from the picture of the corpse shown decedent's wife.

The majority asserts that our decision in *Commonwealth v. Evans*, 465 Pa. 12, 348 A.2d 92 (1975), controls this case. In *Evans*, decedent's daughter was called to testify. While testifying she started to weep. Sustaining the trial court's refusal to grant a mistrial when this occurred we stated: "The Commonwealth . . . must be permitted to [prove its case] by whatever *material* evidence it can muster." (Emphasis added.) Id. at 17, 348 A.2d at 94–95. We concluded that the trial court did not abuse its discretion in denying the motion for a mistrial.

McCormick states: "If the evidence is offered to prove a proposition which is not . . . probative of a matter in issue, the evidence is properly said to be immaterial." McCormick, Evidence § 185, at 434 (1972). Apparently, the daughter's testimony in *Evans* was material and probative and outweighed whatever inflammatory effect her testimony had on the jury. In *Evans* we did not suggest that the trial court should allow evidence such as was admitted here, which had virtually no probative value and which had a high inflammatory potential.

The majority's reading of *Evans* ignores well settled principles of law.

I cannot sanction the Commonwealth's attempt to play on the jury's sympathies in order to win a conviction. The testimony of decedent's widow was unnecessary. Showing her the picture of her dead husband served no purpose but to cause her to grieve before the jury. Appellant objected to her testimony as being inflammatory, an objection which includes a challenge to the probative value of the challenged evidence. Because this evidence had great potential for inflaming the jury, and because it had virtually no additional probative value, I dissent.

NIX and MANDERINO, JJ., join in this dissenting opinion.