Commonwealth *v.* Jennings, Appellant.

Argued March 18, 1971. Before BELL, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

*Arnold W. Hirsch,* for appellant.

*Paul M. Petro,* Assistant District Attorney, with him *John F. Bell,* First Assistant District Attorney, and *Jess D. Costa,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, December 20, 1971:

In the early morning hours of July 27, 1969, the office of an organization providing emergency ambulance service in Washington, Pennsylvania, received a phone call from an anonymous person saying F. K. Fawcett had been injured in a fall and requesting that an ambulance be dispatched to his residence. Mr. Fawcett was an elderly gentleman who lived alone in a house in East Washington which was secluded from other residences in the area.

When the ambulance attendants arrived at the Fawcett residence, they discovered the house had been broken into. They also found Mr. Fawcett dead in a bedroom on the second floor. He was bound and gagged and bore physical marks of a brutal assault. The entire house was in serious disarray indicating it had been ransacked.

In response to phone calls, police officers and a physician arrived on the scene within minutes. An examination of Mr. Fawcett's body disclosed the existence of multiple bruises on the arms, face and head. A subsequent medical examination established that one such wound penetrated the deeper tissues of the scalp rupturing blood vessels between the thin and heavy covering of the brain resulting in a hemorrhage which caused death.

On August 19, 1969, Sean W. Naser was taken into police custody and subsequently admitted having participated in a burglary of the Fawcett residence on the night of July 26th, together with Norvelle DeWitt Jennings, John Allen Banks and Charles Avery. He also gave the police information indicating Jennings and Banks had assaulted Mr. Fawcett during the perpetration of the burglary.[1] As a result, all four individuals were arrested and indicted for burglary, larceny, conspiracy and murder.

Banks was the first to be tried on the charge of murder and was found guilty by the jury of murder in the second degree. The Commonwealth's case against Banks depended almost completely on the testimony of Naser who testified as a Commonwealth witness.

Jennings was tried next and was found guilty by the jury of murder in the first degree with the punishment fixed at life imprisonment. In this instance, Avery joined Naser as a Commonwealth witness against Jennings. The Commonwealth's case was further strengthened by the testimony of a witness who heard Jennings admit involvement in the Fawcett burglary while a prisoner in jail awaiting trial.

Subsequently, both Avery and Naser entered general pleas of guilty to murder indictments. The former was

---

[1] Naser also disclosed that it was he who phoned the ambulance service.

adjudged guilty by the court of murder in the second degree, and Naser was adjudged guilty of voluntary manslaughter.

Banks and Jennings both filed appeals in this Court from the judgments of sentence attacking the validity of their convictions. This opinion concerns only the Jennings appeal.

From the evidence at trial, the jury was warranted in finding the following facts:

About 9:30 p.m., on July 26, 1969, Naser, Banks, Jennings and Avery joined together and traveled in Naser's automobile to the Fawcett residence with the intention of burglarizing it. As they approached the house, they observed a light was lit in one of the rooms on the second floor. A rear door was forced open, and Jennings, accompanied by Banks, entered the house, while Naser and Avery remained on the outside as "lookouts". Jennings and Banks ascended to the second floor, forcibly overpowered Fawcett and struck him many blows to the head and body with their fists. They placed a gag in his mouth, bound his ankles and tied his hands behind his back. They then ransacked the house, took certain property belonging to Fawcett, rejoined Naser and Avery and fled from the scene.

The sufficiency of the evidence to sustain a verdict of guilty of murder in the first degree is not questioned, but it is urged a new trial is required because of prejudicial error during the prosecution proceedings. The trial was of extended duration and many assignments of error are asserted. After studying the record and each alleged error, we conclude the judgment should be affirmed.

It is argued due process was violated in that Jennings "was not tried by a jury of his peers" because "the jury was not properly selected" and "there was a breach of jury security".

In support of the first prong of this contention, it is submitted the trial court erred in excusing a number of prospective jurors for cause, merely because they expressed conscientious scruples against the imposition of the death penalty during voir dire examination. It is maintained this resulted in the selection of a trial jury "biased towards conviction" and also deprived Jennings of his right to a trial before a jury representing "a cross section" of the vicinage.

Due process unquestionably requires that an accused be given a fair trial before neutral and impartial jurors. But in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S. Ct. 1770 (1968), and in *Bumper v. North Carolina,* 391 U.S. 543, 88 S. Ct. 1788 (1968), the United States Supreme Court rejected the argument that disqualifying jurors in a capital case because of their objection to the imposition of the death penalty under any circumstances affects the neutrality and fairness of the jurors on the issue of guilt. See also *Commonwealth v. Roach,* 444 Pa. 368, 282 A. 2d 382 (1971). Since there is nothing else in the record in support of the allegation that the jury was "biased towards conviction", this contention is overruled.

Nor are we persuaded that the excusal of a limited number of jurors for cause because of such conscientious scruples deprived Jennings of a trial jury truly representative of the vicinage. Again, there is nothing in the record to establish that the jurors remaining in the panel were not so representative. Moreover, if Jennings' position on this were sustained on this record, it would logically follow that in every instance where a juror is excused for cause, regardless of the reason, then the selection of the jury would necessarily be contrary to constitutional standards. The folly of such reasoning is self-evident.

Finally, the excusal of jurors for cause is a matter within the discretion of the trial court. *Commonwealth v. Pasco,* 332 Pa. 439, 2 A. 2d 736 (1938). In the instant case, the only jurors disqualified for cause were those who stated they could not vote to impose the death penalty *under any circumstances.* The excusal of these jurors was not an abuse of the court's discretion, nor did it violate constitutional due process. *Witherspoon v. Illinois,* supra. See also *Bumper v. North Carolina,* supra, and *McGautha v. California,* 402 U.S. 183, 91 S. Ct. 1454 (1971).

The contention that "there was a breach of jury security" is based on the following incident at trial.

After some jurors had been accepted by both sides, but before the twelve jurors were accepted, or the jury was sworn or any evidence was introduced, one of the jurors already accepted left the hotel where the jurors were sequestered during a recess, and made a phone call to his daughter. Upon learning of this, Jennings' counsel moved for a mistrial. Upon inquiry, the court learned that the elderly juror involved failed to understand the court's instructions previously given as to sequestration. The court then interviewed each juror who had already been selected and was informed that none had any conversation up to this point with the juror who broke security. The court then excused this juror for cause, directed that another juror be selected from the panel in his stead and overruled the motion for a mistrial. Assuming the action of the court was in derogation of Rule 1111 of the Pennsylvania Rules of Criminal Procedure,[2] the error was clearly harmless.

---

[2] Rule 1111 Pa. R. Crim. P. provides in pertinent part: "In all cases in which a capital crime is charged every trial juror, including any alternates, shall be sequestered from the time he is accepted as a juror until the jury renders a verdict or is discharged by the trial judge."

Another assignment of error insists that Jennings was not properly arraigned, specifically and solely because the court did not read the indictment to him verbatim, as required by Rule 317 of the Pennsylvania Rules of Criminal Procedure.[3]

As to this the record discloses the following:

The selection of the jury for the Jennings trial began on April 22, 1970. Prior thereto, or on April 8th, the accused appeared before the court with his counsel for arraignment.

The indictment charging Jennings with Fawcett's murder, also included the counts charging him with burglary, larceny and conspiracy. Prior to arraignment, Jennings' counsel moved to sever the burglary, larceny and conspiracy counts in the indictment from the murder count, and the motion was granted. During the arraignment proceedings, the court deliberately refrained from reading the complete contents of the indictment to Jennings because it still included the counts charging him with burglary, larceny and conspiracy. However, the court did inform Jennings that he "stands here indicted for the murder of F. K. Fawcett", and inquired how he plead. No objection to the form or the sufficiency of the arraignment was then voiced, but some days later after the trial jury had been completely selected and sworn, a motion for a mistrial was made on the ground that the defendant had not been properly arraigned. Assuming that the procedure employed by

---

[3] **Rule 317 Pa. R. Crim. P.** pertinently provides:

"(a) Arraignment in capital cases shall be conducted in open court and shall consist of a reading of the indictment to the defendant and calling him to plead thereto. . . .

"(b) Arraignment in all cases shall be mandatory . . . unless provided otherwise by local court rule or waived by a defendant who has counsel of his own choice."

No local court rule has been promulgated in Washington County which changes the above-stated rule of criminal procedure.

the court constituted error, again it was clearly harmless. See *Commonwealth v. Phelan*, 427 Pa. 265, 234 A. 2d 540 (1967), cert. denied, 391 U.S. 920, 88 S. Ct. 1803 (1968).

As we explained in *Phelan,* the purpose of the arraignment of a criminal defendant is to fix the identity of the accused, to inform him of the nature of the charges against him and to provide him with the opportunity to plead thereto. See also 21 Am. Jur. 2d, Criminal Law, §452 (1965). The instant record supports no other conclusion but that every purpose of an arraignment was satisfied and no prejudice resulted to Jennings from the court's failure to follow the Rules of Criminal Procedure to the letter.

As noted before, Naser and Avery testified against Jennings at trial as Commonwealth witnesses. Aside from admitting their own participation in the burglary of the Fawcett residence, each witness detailed what they saw Jennings and Banks do in connection therewith. Avery also testified that, while the four participants were driving away from the scene in Naser's automobile, Banks said he and Jennings had tied up "the old man . . . and put him out of the way"; that a few minutes later Jennings said he was getting out of the area because "it was going to be hot . . . and there was going to be a lot of state police going out to the [Fawcett] residence"; and finally, that after their arrest and confinement in jail, Jennings told him, "we would end up beating it if I kept my mouth shut, if all of us kept quiet."

The admissibility of Avery's trial testimony is not challenged, but it is argued that Naser should not have been permitted to testify, and, in any event, his testimony should have been ruled out from the jury's consideration.

The first facet of this contention is that Naser's arrest and questioning by the police, which resulted in his self-incriminating and accusatorial statements, violated Naser's constitutional rights. The simple answer to this position is that Jennings is without standing to make this complaint. *Alderman v. United States,* 394 U.S. 165, 89 S. Ct. 961 (1969).

In support of the contention that Naser should not have been permitted to testify, it is next urged that the trial court erred in refusing a request by Jennings to have Naser examined by a psychiatrist before his testimony was allowed.

A psychiatric examination of a trial witness is largely within the discretion of the trial court and should be ordered only upon a showing of need and justification. *United States v. Klein,* 271 F. Supp. 506 (D.C. 1967). See also *Commonwealth v. Kosh,* 305 Pa. 146, 157 A. 479 (1931). There is nothing in the instant record to indicate any abuse of discretion by the trial court in refusing the requested examination of Naser.

The contention that Naser's testimony should have been ruled out of the jury's consideration is bottomed upon the assertion that during cross-examination Naser admitted "he might change his story in the future", and this established he was an unreliable and untrustworthy witness as a matter of law.

The relevant position of Naser's testimony during cross-examination is as follows:

"Q. When you went over your testimony with Mr. Bell, was your attorney present? A. No, he was not. Q. Do you intend to plead guilty to the charge against you? A. I have to talk it over with my attorney first. Q. Do you think there's still a possibility that after the testimony today, that you will plead not guilty and attempt to get an acquittal? A. I'll have to talk with my

attorney first. Q. Do you intend in the future to testify that you weren't at the Fawcett house that night? Mr. Bell: Objection, Your Honor. THE COURT: No, we will overrule that objection, I think the answer to that is obvious. You can answer the question. [Last question read back by the stenographer.] A. I haven't made up my mind yet. Q. So that I understand, you may go into Court and say that you weren't there that night? A. I have to discuss it with my attorney. Q. Now, if you would go into Court and testify that you weren't there, either your testimony today or your testimony then would be false? A. That's correct."

While it is true that the due process clause of the United States Constitution will not permit a criminal conviction to stand which is obtained through the knowing use of false testimony (*Miller v. Pate,* 386 U.S. 1, 87 S. Ct. 785 (1967), and *Mooney v. Holohan,* 294 U.S. 103, 55 S. Ct. 340 (1935)), there is no constitutional impediment against the evidentiary use of testimony, the veracity or falsity of which is not known. Moreover, we note that the trial court in the instant case called to the attention of the jury that Naser's testimony originated from a corrupt source and should be scrutinized critically and with care before being accepted as true. Cf. *Commonwealth v. Farrell,* 319 Pa. 441, 181 A. 217 (1935). Also that the court instructed the jury that if Naser testified falsely as to any material fact his entire testimony could be rejected. Additionally, it should be noted that the challenged testimony was strongly corroborated by the testimony of another participant in the burglary, namely, Avery. Under the circumstances, the trial court did not err in refusing to rule out Naser's testimony as a matter of law.

In their trial testimony, both Avery and Naser stated that shortly after leaving the area of the burglary in Naser's automobile, the four participants visited a

"Dutch Maid" restaurant connected with a bus station in Washington. In corroboration of this testimony, the Commonwealth called Clara Toland, a waitress in the restaurant, who stated, over objection, that the four including Jennings were in the establishment on the date and at about the time mentioned.

Mrs. Toland said she knew Banks, Avery and Naser from previous visits to the restaurant, but admitted she did not remember ever seeing Jennings before the occasion involved, and she had not seen him since. However, her identification of Jennings was unequivocal and she described a hat he was wearing at the time as "a big hat, pushed up on one side, pinned up on one side". She also explained that after Naser's arrest, police officers came to the restaurant with Naser and she told the officers about the four being there on the night of July 26, 1969.

It is urged it was error to permit this in-court identification of Jennings because the attending circumstances were most suggestive and of the nature condemned in *Foster v. California*, 394 U.S. 440, 89 S. Ct. 1127 (1969); and, *Gilbert v. California*, 388 U.S. 263, 87 S. Ct. 1951 (1967).

In our view, *Foster* and kindred cases do not compel the conclusion that the challenged testimony was erroneously admitted. These decisions proscribe an in-court identification which is the product of an unconstitutionally tainted pre-trial confrontation. Mrs. Toland's in-court identification was not so prejudicially inspired. It was made under oath while Jennings was represented by counsel. See *United States v. Munroe*, 421 F. 2d 644 (5th Cir. 1970); *United States v. Ballard*, 418 F. 2d 325 (9th Cir. 1969); and, *United States v. Moss*, 410 F. 2d 386 (3d Cir. 1969). Moreover, as disclosed by the testimony, Mrs. Toland had the opportunity of observing Jennings at close range in a well-lighted area

for about ten minutes. Additionally, the mode and manner of her identification was fully explored at trial to give the triers of fact ample opportunity to assess the correctness and credibility of her testimony.

The next complaint is that the court erred in permitting the district attorney to cross-examine Jennings concerning his previous criminal record in violation of the Act of March 15, 1911, P. L. 20, 19 P.S. §711.

During direct examination, Jennings testified in great detail about his previous life and stated he had earlier been convicted of committing a series of 26 burglaries and 26 larcenies. During cross-examination, the district attorney inquired without objection as to why he committed these crimes. Jennings' answer was innocuous and no further questioning about Jennings' previous criminal record ensued. Also, the court carefully instructed the jury that the evidence of Jennings' previous criminal record could not be considered as evidence of guilt of the charge then on trial, but was only to be used for the purpose of assessing the credibility of his trial testimony. Under the circumstances, no error was committed.

It is next urged that the trial judge during his instructions to the jury erroneously injected the issue of proximate cause into the jury's deliberations contrary to the teaching of *Commonwealth ex rel. Smith v. Myers*, 438 Pa. 218, 261 A. 2d 550 (1970) ; and, *Commonwealth v. Root*, 403 Pa. 571, 170 A. 2d 310 (1961).

The pertinent portion of the charge complained of is as follows: "You must consider another point and that is whether the act of the defendant was the proximate cause of the death of the victim. If a person with legal malice in his mind, commits an act or sets off a chain of events from which, in the common experience of mankind, the death of another is the natural or reasonably foreseeable result, that person is guilty of mur-

der if death results from that act or from the event which it naturally produced. Of course, if the act was not the cause of the death of the victim there would be no proximate cause and no murder could be found to exist. If you find that an original malicious act of robbery set off such a chain of events in this case, then the person who set off the chain is guilty of murder in the first degree and therefore, if you find that the defendant participated in committing a robbery, and that robbery set off the chain of events which resulted in the death of Mr. Fawcett, the defendant would be guilty of murder in the first degree and I should point out that this would be the case, if he was present and participating, even though he did not actually inflict the injuries which resulted in the death of the decedent."

We accept the position that the court's charge on proximate cause was incorrect and unwise, but we are not persuaded it constituted prejudicial error. Apparently, what the court was trying to explain, is that if Jennings participated in the burglary and the Fawcett homicide was committed in the furtherance thereof, he would still be guilty of murder in the first degree, even if Jennings did not personally strike the fatal blow. This, of course, is the law. *Commonwealth v. Williams*, 443 Pa. 85, 277 A. 2d 781 (1971).

Moreover, no further or explicating instructions to the jury were requested and only a general exception to the charge was entered.

Complaint is also made that the jury failed to follow the instructions of the court in returning its verdict. What happened is this.

During his charge, the trial judge explained that initially the jury was to determine the issue of guilt and to return a verdict informing the court of its findings on this question. The judge then explained that if the jury found Jennings were guilty of murder in the

first degree, it would then be the jury's further duty to fix the penalty "after hearing such additional evidence as may be submitted on that question."

Despite these instructions, the jury returned a verdict as follows: "And now, May 1, 1970, we, the jurors empaneled in the above case, find the defendant guilty of murder in the first degree and recommend sentence at life imprisonment." Over objection, the court accepted the verdict as rendered and it was so recorded.

Jennings suffered no prejudice as a result of the foregoing error and if anything benefited therefrom.

It is contended the trial court committed error in not instructing the jury on voluntary manslaughter, and also by precluding the jury from returning such a verdict in failing to charge such a verdict was within its prerogative. This issue was not raised in the court below and may not be raised for the first time on appeal. *Glass v. Freeman,* 430 Pa. 21, 240 A. 2d 825 (1968).

In sum, our study of the record in this case evidences nothing to warrant our disturbing the judgment entered below. It is, therefore, affirmed.

Mr. Justice ROBERTS concurs in the result.

Mr. Justice JONES took no part in the consideration or decision of this case.