## Commonwealth *v.* Hall, Appellant.

244

Argued January 17, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

 

*Charles J. King, Jr.,* with him *Richard W. Rogers,* and *Rogers & Smith,* for appellant.

*Stewart J. Greenleaf,* Assistant District Attorney, with him *J. David Bean,* Assistant District Attorney, *William T. Nicholas,* First Assistant District Attorney, and *Milton O. Moss,* District Attorney, for Commonwealth, appellee.

Opinion by Mr. Justice Manderino, March 25, 1974:

The appellant, Ronald E. Hall, was found guilty by a jury of assault and battery with intent to ravish, and burglary. Post-trial motions were denied, and concurrent sentences of one to three years imprisonment were imposed for each offense. The Superior Court affirmed the judgment of sentence. *Commonwealth v. Hall*, 221 Pa. Superior Ct. 776, 291 A.2d 897 (1972). We granted appellant's petition for allowance of an appeal.

The appellant raises three issues in this appeal: (1) whether the out-of-court identification testimony should have been suppressed; (2) whether the trial court's conduct during the pretrial suppression hearing violated due process of law; and (3) whether the trial court erred in refusing to charge the jury as requested by the appellant in his points for charge on the "pitfalls of identification testitmony." We find no merit on the assignments of error and, therefore, affirm the judgment of sentence.

From the testimony at the suppression hearing, the following facts can be reasonably inferred. Shortly after noon, on July 8, 1969, Bernadette Hathaway, victim of the charged offenses, was alone in her home. She had just returned from a visit to her doctor, who had told her to remain in bed during her pregnancy or she might lose her baby. Her three-year-old daughter had taken their small puppy outside. She was folding clothes on her kitchen table when a man appeared at the door. He was cleanly dressed and did not frighten her until he entered and began advancing toward her. He told her she would not get hurt if she did not say anything. The man asked her if she had a bathroom. She began moving as she pointed to the bathroom. He grabbed her and pinned her arms to her side and began making sexual advances. She pleaded with the man to let her alone since she was carrying a child and

was sick. She told him she would lose her baby if she got upset.

The man ignored her pleas. He forced her from the the kitchen into the dining room and onto a couch. He got on top of her, began kissing her and moving his body against hers as he unbuttoned her blouse. At this point the victim and her attacker heard the victim's daughter making a racket at the back door. The daughter was hollering at her puppy who would not come into the house. The attacker became frightened and left the dining room. The victim fled and ran into a neighbor's yard. The police were called, but when they arrived the man could not be found.

The victim who had observed her attacker for "no less than ten minutes" gave the following description to the police: "A colored male, 19 to 23 years of age. Young and good-looking. Six feet one to six feet three. Thin built. Kinky hair, Afro style, high. Smooth skin. Clean shaven. Dark brown complexion. Oval face. Clean clothes. Green trousers, green pants. Black shoes. Either red shirt short sleeves, or red and blue plaid."

The victim called her husband at work and he returned home. She described the man to her husband. They discussed the incident on various occasions during the next three months.

On October 18, 1969, approximately three months after the incident, the victim's husband saw a man, the appellant, near their home who fitted the description his wife had given. He rushed home and woke his wife and daughter who were napping. He told his wife that he had seen someone who fitted the description of her attacker and asked her to come and look at the man. Cruising in their car, a short distance from their home, the victim saw the man her husband had seen earlier. The appellant was walking in a park when seen by the victim from the car. Since she did not have a full

front view of the man's face, she was not positive but she told her husband that he seemed to be her attacker. Her husband called the police from a nearby public phone booth and then continued on foot to follow the appellant. The victim remained in the car with her daughter waiting for the police. When the police arrived, the victim pointed out the direction in which her husband had followed the appellant. The police drove in the indicated direction. A short time later, the victim decided to follow in her car rather than sit and wait.

The police met the victim's husband and shortly thereafter, the appellant came out of the drugstore, and was pointed out by the husband. The police told the appellant that he fit the description of a man who had been involved in a crime and asked the appellant to go with them. The appellant agreed to go with the police, answering "Sure, I'll go with you."

The police, the appellant, and the victim's husband, were in the police car about to return to where the victim had remained in her car, when the victim who had decided to follow the police, arrived on the scene. The victim got out of her car and saw the appellant about ten feet away. She immediately recognized him but was unable to speak when questioned because she became frightened and shocked at seeing her attacker again. The appellant said she seemed hysterical and upset. One of the police officers then suggested that everyone return to the Township of Lower Merion. The reason for the suggestion was that the police officers, who were from Lower Merion Township, had crossed over the township line when they were looking for the victim's husband. The police wanted to return to their own municipality. The police took the appellant in the police car and told him what the matter was about as they were returning to the Township of Lower Merion. The victim, her husband and daughter followed in their

car. They drove a short distance and parked in the Township of Lower Merion, near where the police first talked with the victim after they were called by the victim's husband. One of the police officers went over to the victim and asked if she was controlled enough to speak. She said yes and told the officer that the appellant was the man who attacked her. This occurred before the victim viewed the appellant at the new location. He was still in the police car. The victim was still frightened because she feared for her husband and three-year-old daughter who were present. She was asked to view the appellant again. She did and answered affirmatively when asked several times if she was positively sure. The appellant was then taken to the police station. The victim's baby was born about three months later.

During the trial, the victim testified about the circumstances surrounding the out-of-court identification and also identified the appellant in court. The police and her husband corroborated her testimony.

The appellant denied that he had attacked the victim. He testified that at the time of the incident, on July 8, 1969, he was with a friend in Philadelphia looking for work because he had been fired from his job on July 7, 1969, the day before the incident. The prosecution presented time records showing that the appellant had begun work on July 8, 1969, at 1:30 p.m., about an hour after the alleged incident. The appellant's supervisor at the playground where appellant worked testified that the appellant was at work and had not been fired on July 7, 1969.

The appellant first argues that the out-of-court identification should have been suppressed because the police did not have probable cause to arrest the appellant. We disagree. The first encounter between the police and the appellant occurred outside the drugstore. There was no seizure of the appellant by the police at that

time. The appellant admitted that he was asked to go with the police and he agreed. Although they got into the police car and drove about fifteen feet, they did not go anywhere because the victim arrived on the scene. During the suppression hearing, the appellant was asked about this encounter: "Q. Isn't it true, Mr. Hall, that the officer, when he asked you, when you got out of the drugstore, asked you to go with him, as you fit the description of a man who had been involved in a crime? And didn't you say to him, 'Sure, I'll go with you?' Didn't you voluntarily go with him? A. Yes, I voluntarily went with him. Yes."

There was thus no seizure of the appellant prior to the first confrontation with the victim. When that confrontation took place, a new dimension was added to the probable cause issue. The victim's immediate reaction, even though she made no *verbal* communication, was a sufficient communication from which reasonable police officers could conclude that the appellant was not a stranger but was the man who had attacked her. The police were observing the victim's reactions when she first saw the appellant and saw that the victim had lost control of herself. Nothing occurred that would explain her reactions except an inferred recognition of her attacker. We cannot say that at that point the police did not have probable cause to detain the appellant.

The issue of probable cause is a commonsense determination of reasonableness. "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life in which reasonable and prudent men . . . act." *Brinegar v. United States,* 338 U.S. 160, 175, 93 L.Ed. 1879, 1890, 69 S. Ct. 1302, 1310 (1949) ; *cf. Spinelli v. United States,* 393 U.S. 410, 21 L.Ed. 2d 637, 89 S. Ct. 584 (1969) ;

*United States v. Ventresca,* 380 U.S. 102, 13 L.Ed. 2d 684, 85 S. Ct. 741 (1965).

The appellant next contends that the out-of-court identification should have been suppressed because it was staged by the police and was suggestive. We disagree. This is not a case in which a one-on-one confrontation between an eyewitness and a citizen results in an identification *after* the eyewitness knows of a prior police judgment that the confronted citizen is the person who committed the crime. In such cases, because the eyewitness may have been influenced by knowing of the prior police judgment, the identification, resulting from the one-on-one confrontation, is inadmissible except in the cases involving fresh on-the-scene confrontations. *Commonwealth v. Mackey,* 447 Pa. 32, 288 A.2d 778 (1972).

In this case, the one-on-one confrontation resulted in an identification by the victim *without* any prior police judgment that the citizen was, or might be, the person who committed the crime. The victim could not have been influenced by knowledge of a prior police judgment when no such judgment ever occurred. We, therefore, cannot conclude that any suggestiveness by the police took place which influenced the victim's identification of the appellant. The out-of-court identification was therefore admissible, and did not illegally taint the in-court identification. The in-court identification also had an independent basis since the victim had observed the appellant at close range for "no less than ten minutes." *See Commonwealth v. Jennings,* 446 Pa. 294, 285 A.2d 143 (1971); *cf. Commonwealth v. Pitts,* 450 Pa. 359, 301 A.2d 646 (1973).

The appellant next contends that the judge's remarks during the suppression hearing indicate a judicial disposition, before all the evidence had been heard, to admit the out-of-court identification. We have examined the record of the suppression hearing and

cannot find that "[the judge] was 'so prejudiced or biased that his mind [was] not open to conviction by the last evidence presented.' " *Commonwealth v. Owens,* 444 Pa. 521, 281 A.2d 861 (1971).

The last contention of the appellant is that the trial court erred in refusing instructions submitted by the appellant. The instructions all concerned the hazards of identification testimony and emphasized the unreliability of identification suggested by police conduct. In his charge, the trial court said the following:

"[O]bviously one of the key issues in this case, Members of the Jury, is the identity of the person who committed the crime charged. . . . The identity of a person is necessarily determined by the expression of opinions by witnesses that a certain person is the one involved. Two things must be considered in solving the problem of whether a true identification has been made. First, consider the general credibility of the witness who makes the identification. And, secondly, consider the basis upon which the identification was made.

. . . .

"[Y]ou . . . have to determine whether his or her observation and memory are to be credited. For credible witnesses can be mistaken. . . . You must test a witness's evidence by considering the circumstances under which the identification is made and whether her testimony is shaken by facts on cross-examination and many other considerations.

"The rule which you are to follow is this: Where the opportunity for positive identification is good, and the witness is positive in her identification and such identification is not weakened by any prior failure to identify, or other circumstances, but remains, even after cross-examination, positive and unqualified, the testimony as to identification is to be examined in the ordinary fashion by the application of the ordinary

rules of credibility which I have already described to you. You appraise the witness and her opportunity for observation and memory; the items of identification relied upon surrounding the opinion of identity, and so forth. After deciding the general question of credibility, decide if the witness is correct when she says at trial that the defendant is the one involved in the issue.

"On the other hand, where you find that the witness was not in the position to clearly observe the party involved, or she was not positive in her identification of the defendant, or her positive statements as to identity were weakened by qualification, or by a previous failure to identify, or by cross-examination, or any other circumstances which you consider important, then you should not accept such testimony at face value without carefully scrutinizing it to determine whether the opinion as to identity was correct."

The charge adequately instructed the jury concerning identification testimony. *Cf. Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820, *cert. denied*, 348 U.S. 875, 99 L.Ed. 688, 75 S. Ct. 112 (1954). The trial court properly refused the instructions requested which emphasized police suggestiveness in identifications. The circumstances in this case did not require such special instructions.

Judgment of sentence affirmed.

Mr. Chief Justice JONES and Mr. Justice EAGEN concur in the result.