391 A.2d 1027

COMMONWEALTH of Pennsylvania

v.

Gilbert L. KINGSLEY, Appellant.

Supreme Court of Pennsylvania.

Argued March 13, 1978.

Decided Oct. 5, 1978.

Harry R. Ruprecht, Louise Porac, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Asst. Dist. Atty., Leo M. Dillon, Pittsburgh, for appellee.

Before O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

O'BRIEN, Justice.

Appellant, Gilbert L. Kingsley, was convicted by a jury of voluntary manslaughter. Post-verdict motions were denied and appellant was sentenced to thirty days' imprisonment and ten years' probation, with the additional requirement that he undergo alcoholic evaluation and counseling. Shortly after appellant was originally sentenced, the trial court reduced the probationary term to twenty-three and one-half months. This direct appeal followed.

Appellant first challenges the sufficiency of the evidence, alleging two defects in the case presented at trial. The facts are as follows.

On May 28, 1976, Benjamin Crowther, age forty-six, the victim, returned home from his job to find appellant, age forty, assisting the victim's wife, Ruth Crowther, in the preparation of Workmen's Compensation papers. An argument eventually broke out between appellant and the victim. Mr. Crowther called appellant several names and when appellant told the victim "you can't back it up," Mr. Crowther attempted to attack appellant. Appellant sidestepped Crowther, grabbing him around the neck and turning him around. Appellant then punched Crowther in the face, knocking him to the floor. According to appellant's confession, he then "stomped" on Crowther's face. At trial, appellant testified that he placed his foot on the victim's throat in an attempt to restrain him.

When Mrs. Crowther saw her husband bleeding from the nose and mouth, she called the police. When the police and paramedics arrived at the Crowther house, Mr. Crowther refused medical attention. Appellant then left the Crowther residence at approximately 1:00 p. m. Mrs. Crowther left shortly thereafter, joining appellant in a neighborhood tavern. Mrs. Crowther talked to her husband on the phone at 8:30 p. m. and he seemed normal. When Mrs. Crowther returned home at 10:00 p. m., she found her husband dead.

In *Commonwealth v. Rose,* 463 Pa. 264, 267–68, 344 A.2d 824, 825 (1975), we stated:

"The test of sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth and drawing the proper inferences favorable to the Commonwealth, the trier of fact could reasonably have found that all of the elements of the crime had been established beyond a reasonable doubt. . . . Moreover, it is the province of the trier of fact to pass upon the credibility of witnesses and the weight to be accorded the evidence produced. . . . The fact-finder is free to believe all, part, or none of the evidence." (Citations omitted.)

Appellant first argues that the Commonwealth failed to prove that he caused the victim's death. We do not agree.

■ Dr. Howard Reidbord, a forensic pathologist from the Allegheny County Coroner's Office, performed the autopsy on Mr. Crowther. Dr. Reidbord testified that he conducted both an external and an internal examination. Dr. Reidbord testified as follows about the external examination.

" . . . On the body there was, I noticed, the following evidence of recent injury. There was a considerable amount of blood in the nose and in the mouth. There was a bruise over the chin and over the side of the mouth, over the upper lip and over the tip of the nose. These areas were darker red, purple, much the same as what we call a contusion or a bruise, a bump. On the inside of the upper lip there was a laceration, which is a cutting or tearing of the skin. That was inside the upper lip. The upper lip also appeared swollen and there was bleeding into the tissues of the upper lip. The lower lip showed a similar laceration approximately a quarter of an inch in length. There was hemorrhage in the gums and the tissue of the lower lip on the inner aspect. Those were the only injuries that were noted, recent injuries, on the outer aspect of the body."

When discussing the internal examination, Dr. Reidbord testified:

"In summary, the thyroid showed injury, there were injuries to the soft tissues at the base of the brain around the neck hemorrhage in the renal area, hemorrhages in the scalp and hemorrhage in the sinuses.

"In addition to these findings there was evidence of chronic disease in the deceased. This consisted of abnormal amounts of fat in the liver called fatty change of the liver. There was hardening of the artery from the heart, atherosclerosis of the valve of the heart, the aortic valve, which is one of the valves in the heart. From the heart to the main distribution of blood this valve was hardened and did not function normally. The arteries that supply the heart muscle, called the coronary muscles, showed marked, that is, rather severe blockage of the inside with atherosclerosis. That is hardening of the arteries. In addition,

the microscopic examination, examination with the microscope, showed that there was some chronic inflammation, 'chronic' meaning over a period of time, and that's a broad period of time. By examining the different types of cells I could tell that in the spinal cord the covering of the spinal cord had been inflamed at some time and was still slightly inflamed. There was chronic inflammation of the spinal covering.

"Those constituted my findings at autopsy."

Dr. Reidbord was then asked:

"Q. [Assistant District Attorney] Going to the recent injuries that you described, the external injuries and the internal injuries, did some of the injuries that you described correspond? That is, some were external and also from the injury you had some findings internally?

"A. As to the correlation between the two—it was suggested, in effect, that he had injuries to his face and to his neck, so the answer to the question is yes, they were correlated, in my opinion, but the injuries to the face were probably related to the injuries inside the neck and the throat. The injury in the kidney was in a separate site and I couldn't relate that in any way to the injuries at the top of the body. In addition, there was, of course, the bruise in the undersurface of the scalp which, again, is related, in my opinion, to the injuries to the head and neck."

Dr. Reidbord was next asked the cause of the victim's injuries and he stated:

"It is my opinion, based on the examination of the body, that the injuries received to the neck were received as a result of force applied to the front of the neck. In my experience this would be due to a force applied either possibly manually or as seen in types of manual strangulations. It was my opinion that this was most likely the cause of the injuries on the underside of the cartilage of the neck, as I described before. The injuries to the front of the face were caused by some object striking the face

or the face striking an object. This is called blunt force injury. The lacerations of the inside of the lip, in my opinion, were due to the lips being pressed up forcefully against the teeth and being lacerated. Again, the injury to the kidney area and the back of the neck and scalp were due to a force being applied to the skin of the back of the head. The injury deep in the neck, the one I described around the spinal cord, in my opinion, was due to the neck being moved in an abnormal way so that the tissues tore and there was hemorrhage."

When asked to give the cause of the victim's death, Dr. Reidbord gave the following responses:

"A combination of the injuries would be considered, in my opinion, as causing the death. The combination of the injuries to the tissues around the base of the brain, in the tissue around the spinal cord, and the hemorrhages in the neck, deep in the neck, would be, in my opinion, the cause of death, a combination of these injuries, and I would not be able to specifically say which one was immediately responsible, but the combination of injuries was responsible.

      \*     \*     \*     \*     \*     \*

"Death was due to hemorrhage and contusions of the back of the neck and hemorrhages in the voice box, cartilage of the throat, and it was due to abrasions and contusions of the face, and hemorrhage of the kidney, a combination."

Finally, on cross-examination, the following exchange occurred:

"Q. [Defense counsel] Doctor, when you take into consideration that this man had aortic stenosis, a severe coronary disease, fatty liver, disease of the kidneys, when you take the fact that you have indicated that it is possible that he could have died from natural causes and you take into consideration your findings that there were superficial injuries of the face and that your two significant findings were the .5 centimeters focal hemorrhages of the neck and the

slight hemorrhages in the back, you can't say beyond a reasonable doubt that this man died from those injuries. Isn't that true?

"A. No. The answer is no. I can say and I do say. I think there is a possibility that other things happened, but in my mind beyond a reasonable doubt all those other possibilities could have happened, possibilities, in my mind. Had he not received the beating, I have no reason to assume he would have died. That means in my mind, beyond a doubt, I think there are other possibilities, but beyond a doubt, the man received trauma to his neck and died as a result of the trauma."

Appellant called his own expert pathologist, Dr. Sanford Edberg. Based on his own review of Dr. Reidbord's findings, Dr. Edberg testified that he believed the external wounds were simply too superficial to cause death. Dr. Edberg believed that the victim died from a combination of severe heart disease and acute and chronic alcoholism.

As in all criminal prosecutions, the Commonwealth has the burden of proving beyond a reasonable doubt all of the elements of the crime charged. As we stated in *Commonwealth v. Hicks,* 466 Pa. 499, 504, 353 A.2d 803, 805 (1976):

"The Commonwealth must prove that appellant's blows were the legal cause of death beyond a reasonable doubt. . . . However, causation is an issue of fact for the jury to decide. . . . The jury was free to accept the medical opinion of the Commonwealth's pathologist and reject the opinions of the defense expert witness. . . It is clear that accepting as true all the evidence and all reasonable inferences therefrom, in a light most favorable to the Commonwealth, the jury had sufficient basis to conclude beyond a reasonable doubt that the blows delivered by the banister rung and appellant's fists were the legal cause of Turner's demise." (Citations omitted.)

As in *Hicks*,[1] we find here that the Commonwealth has presented sufficient evidence to prove beyond a reasonable doubt that appellant's actions were the cause of the victim's death.

Appellant next claims that the Commonwealth failed to prove that he specifically intended to kill the victim. We disagree.

■ Detective Charles Moffatt interviewed appellant the day after the incident in question. Moffatt testified at trial that appellant told him he had stomped the victim three or four times while Mr. Crowther was on the ground. Gerald Waldo, the Crowthers' landlord, testified that he heard loud voices coming from the Crowthers' apartment followed by five consecutive thumps. At trial, appellant denied stomping the victim in the head.

■ Specific intent to kill may be inferred from the use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. O'Searo*, 466 Pa. 224, 352 A.2d 30 (1976). In *Commonwealth v. Conner*, 445 Pa. 36, 282 A.2d 23 (1971), we held that a jury could infer the specific intent to kill from the defendant's repeated kicks to the victim's head. We thus believe the Commonwealth has presented sufficient evidence to prove the required specific intent to kill.

Appellant next raises three issues concerning the voir dire examination of prospective jurors. Appellant first argues that the court erred in refusing the following questions on the credibility:

"25. Would you give any more credibility to the testimony of a forensic pathologist, who was employed by the coroner of Allegheny County, than you would to any other forensic pathologist.

\* \* \* \* \* \*

1. In *Commonwealth v. Hicks, supra,* the victim had emphysema and arteriosclerosis. The prosecution's expert testified that the blows struck therein complicated a pre-existing heart condition, causing death.

"27. Would you give any more credibility to the testimony of a homicide detective than you would any other witness."

■ We believe the court properly refused Question # 27, since it did allow the following question to be asked:

"24. Would you give any more credibility to the testimony of a police officer that [sic] you would to any other witness."

Since Question # 24 covered any possible bias in favor of police officers, the trial court properly refused Question # 27.

■ Appellant also argues that it was error to refuse Question # 25. Appellant cites *Commonwealth v. Futch,* 469 Pa. 422, 366 A.2d 246 (1976) in support of his argument. We believe, however, that appellant's reliance on *Futch* is misplaced:

"The singular purpose of voir dire examination is to secure a competent, fair, impartial and unprejudiced jury. In pursuit of that objective, the right of a litigant to inquire into bias or any other subject which bears on the impartiality of a prospective juror has been generally recognized. Nevertheless, the scope of voir dire examination rests in the sound discretion of the trial judge and his decisions will not be reversed unless there is an abuse of that discretion." *Commonwealth v. Futch, supra,* 469 Pa. at 426–27, 366 A.2d at 248.

In *Futch,* the trial court refused the two following questions:

"(1) Would the fact that all of Mr. Futch's material witnesses are incarcerated at Western Penitentiary make their testimony less believable than any witness that the Commonwealth may produce who are not prisoners?

\*    \*    \*    \*    \*    \*

"(3) Would you give more credence to the testimony of a prison guard than you would to a prisoner, simply because he is a prison guard?"

In that case, we recognized the likelihood that a bias against prison inmates existed, and thus it was error to refuse questions 1 and 3 to be asked on voir dire. We believe that the reasoning in *Futch* concerning prisoners is simply inapposite when talking about forensic pathologists. Because we do not believe *Futch* to be controlling, we find no abuse of discretion in the trial court's refusal to allow Question # 25.

■ Appellant next complains that the court erred in refusing to allow the following questions to be asked during voir dire:

"17. Do you have any problem in your own conscience with the legal principle that, as Gilbert L. Kingsley sits here now, he is presumed innocent.

"18. Do you have any problem in your own conscience that the burden of proof is upon the Commonwealth to prove beyond a reasonable doubt that the Defendant is guilty of the charges against him.

"19. Do you have any problem in your own conscience that it is incumbent upon the Commonwealth to prove the charges here beyond a reasonable doubt and it is not incumbent upon Gilbert L. Kingsley, who is presumed innocent, to prove he is not guilty.

"20. Are you willing to acquit the Defendant unless the Commonwealth of Pennsylvania overcomes the presumption of innocence and proves the charges beyond a reasonable doubt.

"21. Do you agree that the presumption of innocence is so strong that the Defendant may even rely upon it and that he has no duty to take the stand to prove his innocence.

"22. Do you agree that you will acquit Gilbert L. Kingsley unless the Commonwealth of Pennsylvania proves each and every element of the offenses charged beyond a reasonable doubt.

"23. Do you agree that even if the Commonwealth of Pennsylvania proves some of the elements of the offenses charged but does not prove each and every element of the

offenses charged beyond a reasonable doubt, that you will acquit Gilbert L. Kingsley."

We can find no error in the court's refusal, as we have held voir dire questions concerning legal principles to be improper questions. *Commonwealth v. Lopinson,* 427 Pa. 284, 234 A.2d 552 (1967).

■ Appellant next believes the court erred in allowing prospective jurors to be asked if they had any conscientious objections to bringing back a verdict which would require imposition of a life sentence. Appellant argues that he was unduly prejudiced by this question, since the Commonwealth had no evidence of murder of the first degree. Appellant believes this to be so, since a demurrer was sustained to murder of the first degree. At the time of voir dire, however, the Commonwealth believed that its evidence could support a finding of murder of the first degree. Under these circumstances, we can find no reversible error in allowing the question concerning the imposition of a life sentence.

■ Appellant next argues that his confession was improperly admitted. Appellant believes that the suppression court erred in refusing to suppress the statement on grounds of voluntariness. The facts are as follows.

After the body of Mr. Crowther was discovered, police sought to question appellant. He was questioned by Detective Charles Moffatt, who testified that he twice informed appellant of his constitutional rights. Appellant told Detective Moffatt that he understood his rights, but was willing to waive them and talk to police. In an interview that lasted less than forty-five minutes, Moffatt noticed nothing unusual about appellant's appearance. Moffatt also testified that he did not smell alcohol on appellant's breath. It is the substance of this forty-five minute interview that appellant sought to have suppressed because, in his version, he did not voluntarily waive his constitutional rights. We, however, do not agree.

In *Commonwealth v. Kichline,* 468 Pa. 265, 279–81, 361 A.2d 282, 290 (1976), we stated:

". . . Although there is no single litmus-paper test for determining the voluntariness of a confession, it must be established that the decision to speak was a product of a free and unconstrained choice of its maker. . . . All attending circumstances surrounding the confession must be considered in this determination. These include: the duration and methods of the interrogation; the length of delay between arrest and arraignment; the conditions of detainment; the attitudes of the police toward defendant; defendant's physical and psychological state; and all other conditions present which may serve to drain one's power of resistance to suggestion or to undermine one's self-determination.

\* \* \* \* \* \*

"The court must determine whether the Commonwealth has established by a preponderance of the evidence that the confession was voluntary and that the waiver of constitutional rights was knowing and intelligent. . . . Our responsibility on review is 'to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings.' . . . In making this determination, this Court will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted." (Citations omitted.)

In the instant case, we find sufficient evidence to establish a knowing, intelligent and voluntary waiver by appellant of his constitutional rights.

■ Appellant next claims that the court erred in admitting the entire interview into evidence. During the interview with Moffatt, appellant told police that he had lived with Mrs. Crowther before her marriage to the victim and was still seeing her on a semi-regular basis. Appellant further told police that the victim had been aware of the relationship. Appellant now argues that this information was not relevant and thus inadmissible. At trial, however, appellant never challenged the questioned evidence's rele-

vency and the issue is waived. *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974).

Appellant next argues that the trial court erred in admitting appellant's confession before the corpus delicti of the homicide was established. We do not agree.

As we stated in *Commonwealth v. Ware,* 459 Pa. 334, 365, 329 A.2d 258, 274 (1974);

"We have followed Professor Wigmore's analysis that a crime conceptually consists of three elements: 'first, the occurrence of the specific kind of injury or loss . . . ; secondly, somebody's criminality (in contrast, e. g., to accident) as the source of the loss,—these two together involving the commission of a crime by somebody; and, thirdly, the accused's identity as the doer of this crime.' 7 J. Wigmore, Evidence § 2072, at 401 (3d ed. 1940) (emphasis removed); see *Commonwealth v. May,* 451 Pa. 31, 32, 301 A.2d 368, 369 (1973). Corpus delicti, meaning 'body of the crime,' consists of the first two elements. *Commonwealth v. May,* supra; *Commonwealth v. Rhoads,* 225 Pa.Super. 208, 213, 310 A.2d 406, 409 (1973). Specifically, ' "*[t]he corpus delicti [in a murder prosecution] consists of proof that a human being is dead and that such death took place under circumstances which indicate criminal means or the commission of a felonious act.*" ' *Commonwealth v. Milliken,* 450 Pa. 310, 317, 300 A.2d 78, 82 (1973), quoting *Commonwealth v. Frazier,* 411 Pa. 195, 202, 191 A.2d 369, 373 (1963)." (Emphasis added.)

In the instant case, there is no question that the victim was dead. Further, Dr. Reidbord's testimony established that the victim's death was the result of a beating to the face. As the corpus delicti was established prior to the admission of appellant's confession, we find no merit in appellant's argument.

Appellant next argues that the court erred in refusing his motion for a mistrial. The facts are as follows.

As previously mentioned, Dr. Howard Reidbord testified for the Commonwealth concerning the cause of the victim's

death. During a lengthy and extensive cross-examination, the following exchange occurred:

"Q. [Defense counsel] In fact, after that conference did you say you were so unsure because of the new evidence that the man did not die suddenly that you wanted to confer with Cyril Wecht?

"A. Absolutely not. I made it very clear to you that I wanted to confer with Doctor Wecht based on the information you gave me, and that in no way did this indicate that I was unsure. This merely was additional information that I wanted to consider. There is a big difference between considering information and being unsure.

"Q. So that we are not unfair about this, you said you were going to reconsider this whole case based on this information?

"A. I said specifically, my notes indicated, that I was going to take into consideration what had been told me and I was going to reconsider based on events that you may have made up out of thin air. I have no idea where you got this. You told me the man was doing this, the man was doing that. I had no idea if it was true. You said what if this was true, what if that were true. I said, 'If you want an answer to the question, let me think about it.' I came back and called you and said this was a homicide. That was my conclusion.

"Q. Did you indicate to me when you called me that you had talked with Cyril Wecht?

"A. Yes. I discussed the case with Doctor Wecht and we concurred completely, this was a homicide."

Appellant then made a motion for a mistrial, which was denied. We believe the court below was correct in refusing the motion for a mistrial for two reasons: First, and most important, the response of Dr. Reidbord was elicited by appellant's own counsel on cross-examination. Because of this, appellant cannot now complain. *Commonwealth v. Brown*, 462 Pa. 578, 342 A.2d 84 (1975). Second,

the trial court offered to instruct the jury to disregard any mention of Dr. Wecht's opinion. Counsel refused the offer, stating that such an instruction would only draw attention to the comment. Appellant's claim that this remark entitles him to a new trial is meritless.

Appellant next argues that the trial court erred in improperly questioning appellant during the Commonwealth's cross-examination of appellant. Our review of the record shows no questioning of appellant by the court; thus appellant's contention is meritless.

Appellant next argues that the court below improperly summarized the testimony of Gerald Waldo, the victim's landlord who testified that he heard five thumps coming from the victim's apartment. We find no merit in appellant's argument.

The trial court summarized the testimony of every witness who testified at trial, thus negating appellant's claim that the court was emphasizing Waldo's testimony. Further, our review indicates that the court's summary of the testimony was fair and in no way prejudicial. Appellant's claim is thus meritless.

Appellant next complains that the trial court erred in its charge to the jury. The questioned portion of the charge relates to the cause of death. Twice during the charge, the court told the jury that in order to convict appellant of either murder of the third degree or voluntary manslaughter, they must find that the death of the victim would not have occurred but for appellant's act. Appellant believes this charge entitles him to a new trial. We disagree.

In *Commonwealth v. Massart,* 469 Pa. 572, 577, 366 A.2d 1229, 1232 (1975), we stated:

"One charged with homicide cannot escape liability merely because the blow he inflicted is not mortal, or the immediate cause of death. *If his blow is the legal cause, i. e., if it started a chain of causation which led to the death, he is guilty of homicide.*" (Emphasis added.)

The two questioned portions of the charge on causation are thus incorrect. Nonetheless, we do not believe appellant is entitled to a new trial, as we can find no prejudicial error in the charge.

In *Commonwealth v. Stafford,* 451 Pa. 95, 98, 301 A.2d 600, 602 (1973), we stated:

"Reading the court's charge as a whole, as we must, see, e. g., *Commonwealth v. Zapata,* 447 Pa. 322, 328, 290 A.2d 114, 117–18 (1972); *Commonwealth v. Butler,* 442 Pa. 30, 34, 272 A.2d 916, 919 (1971), we are convinced that the jury was properly instructed. In defining the crimes charged, it was implicit that the acts of the culprits must be a direct cause of the death to sustain a conviction. Further, the jury was explicitly told that it had to determine how the deceased died and that the Commonwealth had the burden of proving beyond a reasonable doubt every element necessary to constitute the crimes charged. . . . ."

Similarly, in this case the jury was told appellant's acts must have been the *direct cause* of the victim's death. The jury was also told that the Commonwealth had the burden of proving beyond a reasonable doubt all the elements, including causation, of the crimes charged. Reading the charge as a whole, we believe the jury was properly instructed on the issue of causation. See also, *Commonwealth v. Jennings,* 446 Pa. 294, 285 A.2d 143 (1971).

■ Appellant next complains that the court erred in allowing the autopsy report to go out with the jury. Pa.R. Crim.P. 1114 provides:

"Upon retiring for deliberations, the jury shall not be permitted to have a transcript of any trial testimony, nor a copy of any written confession by the defendant, nor a copy of the information or indictment. Otherwise, upon retiring, the jury may take with it such exhibits as the trial judge deems proper."

As the report was received into evidence without objection, we can find no error in allowing the jury to have a copy during its deliberations.

■ Appellant finally argues that the court erred in allowing the jury to deliberate too long before permitting them to retire for the night. The facts are as follows.

The jury was originally sent out to deliberate before lunch on October 20, 1976. At 6:30 p. m., the jury had sent out a series of questions which the court answered. The court then sent the jury to dinner and asked if anyone had any objections to continuing deliberations after dinner. No objections were entered. At 11:20 p. m., the jury came back with more questions. After being reinstructed, the court asked the jury if they wished to continue deliberating or would they rather retire for the night. The jury indicated they would rather retire and the judge acceded to their wishes. The jury began deliberating the next day at 9:30 a. m. and brought back its verdict at 11:10 a. m.

In *Commonwealth v. Ford,* 451 Pa. 81, 85, 301 A.2d 856, 858 (1973), quoting *Commonwealth v. Campbell,* 445 Pa. 488, 495–96, 284 A.2d 798, 801 (1971), we stated:

".   .   . '[t]he length of the deliberation of a jury is wisely left to the sound discretion of the trial Judge, and we reverse only if we find .   .   . abuse of discretion, or that the verdict was the product of coercion or of an overworked and fatigued jury.' "

In this case, defense counsel entered no objection to the jury's continuation of deliberations after dinner. Further, we can find no abuse of the trial court's discretion. Appellant's claim is thus without merit.

Judgment of sentence affirmed.

MANDERINO, J., files a dissenting opinion.

EAGEN, C. J., took no part in the consideration or decision of this case.

MANDERINO, Justice, dissenting.

I dissent. The majority justifies the *voir dire* question indicating murder of the first degree by concluding that before the grant of the demurrer, the prosecution "still believed that its evidence could support a finding of murder

580

of the first degree." This conclusion is unwarranted from the record. The prosecution had no facts justifying a belief that it could support first degree murder. The *voir dire* questioning injected an unwarranted element and tone that were prejudicial.